# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Perkey v. Portes-Jarol, 2013 IL App (2d) 120470**

---

| | |
|---|---|
| Appellate Court Caption | CHARLES PERKEY, Administrator of the Estate of Leanne Perkey, Deceased, Plaintiff-Appellee, v. MICHELLE PORTES-JAROL, Special Administrator of the Estate of Steven A. Portes, Deceased, and ASSOCIATED PHYSICIANS OF LIBERTYVILLE, S.C., d/b/a Winchester Medical Group, Defendants-Appellants. |
| District & No. | Second District<br>Docket No. 2-12-0470 |
| Filed | April 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Judgment was properly entered for plaintiff in his medical malpractice action for defendants' failure to properly diagnose and treat his decedent's pancreatic cancer where any conflict in the testimony of plaintiff's expert was a matter for the jury and the version of the pattern instruction on the standard of care given by the trial court correctly stated the law and was not error; however, the denial of defendants' motion to reduce the judgment by medical charges associated with the claim pursuant to section 2-1205 of the Code of Civil Procedure was reversed and remanded. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 08-L-52; the Hon. Margaret J. Mullen, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

James K. Horstman, of Cray, Huber, Horstman, Heil & VanAusdal LLC, of Chicago, for appellants.

Robert G. Black, of Law Offices of Robert G. Black, of Naperville, for appellee.

Panel          JUSTICE SPENCE delivered the judgment of the court, with opinion.
               Justices Hutchinson and Birkett concurred in the judgment and opinion.

## OPINION

¶ 1     Plaintiff, Charles Perkey, administrator of the estate of Leanne Perkey, deceased, brought a wrongful death/survival action, based on alleged medical malpractice, against defendants, Michelle Portes-Jarol, special administrator of the estate of Dr. Steven A. Portes, deceased, and Associated Physicians of Libertyville, S.C., d/b/a Winchester Medical Group. The jury returned a verdict of $600,000 in plaintiff's favor, with $310,000 of that amount for medical expenses. Defendants seek reversal on appeal, arguing that: (1) plaintiff's standard-of-care expert based her opinions on a legally improper standard of care; (2) plaintiff failed to present sufficient evidence on the issue of proximate causation; (3) the trial court erred in giving the jury the 2006 version of a pattern jury instruction, which did not correctly state the law; and (4) the trial court erred in denying defendants' motion to reduce the judgment under section 2-1205 of the Code of Civil Procedure (735 ILCS 5/2-1205 (West 2010)). We agree with defendants' fourth argument and therefore affirm in part, reverse in part, and remand the cause.

¶ 2                                I. BACKGROUND
¶ 3                            A. Leanne's Medical History
¶ 4     On February 13, 2001, Leanne visited the office of Dr. Portes. She was seen that day by physician's assistant Patricia Graham. Leanne said that she had back pain that kept her awake at night and that she could not alleviate the pain with over-the-counter medication. Leanne thought it might be something to do with her new workout routine. Graham ordered blood work, a urinalysis, and an X-ray of Leanne's abdomen. Those tests were normal. Graham also ordered an abdominal CT scan to rule out the possibility of kidney stones as the pain's source.

¶ 5     Leanne had the CT scan the next day at Gurnee Radiology Center. Dr. Judy Huang, a radiologist, interpreted the CT scan. A copy of the radiology report was forwarded to Dr. Portes's office. The report, which was admitted into evidence, stated that "the pancreatic duct

is dilated as seen along its body extending to the head." It also stated: "Dilation of the pancreatic duct. Correlation with clinical and laboratory findings is recommended with additional evaluation with ERCP [endoscopic retrograde cholangiopancreatography] to assess for either stricture or tumor causing this finding."

¶ 6      Leanne testified in an evidence deposition as follows. She returned to Dr. Portes's office on February 15, 2001, to discuss the results. She met with Dr. Portes that day. Dr. Portes examined her "briefly," poking around on her back until he found the spot that was bothering her. Dr. Portes told her that there was "nothing significant" in the CT scan. He did not share any medical records with her or read to her from the radiology report. He did not tell her that her pancreatic duct was wider than it should have been, that the radiologist saw an abnormality in her pancreatic duct, or that she might have a tumor there. Dr. Portes also did not say that the report recommended an ERCP or a referral to a gastroenterologist. She would have remembered any references to "tumor" or "cancer" because both of her parents died from cancer. Instead, Dr. Portes said that he would have additional tests done on blood that had already been drawn. He said that he did not need to see her again unless there were any abnormalities in the additional blood tests. A nurse called about one week later saying that the additional blood tests were normal.

¶ 7      Dr. Portes testified in his evidence deposition as follows. He reviewed the radiologist's report before seeing Leanne. Dr. Huang did not report seeing a tumor in Leanne's pancreas or say that she had cancer. To the contrary, her report said, "A discrete mass in the pancreatic head is not identified." Dr. Portes read to Leanne from the report, including telling her that the widening of the duct could have been caused by a tumor. Leanne did not have any symptoms or complaints consistent with pancreatic cancer (weight loss; fatigue; burning eyes; jaundice; abdominal pain; loss of appetite; nausea; vomiting; diarrhea). Therefore, Dr. Portes ordered amylase and lipase tests to see whether pancreatitis was causing the widening of the duct. They agreed to a "wait and see" approach before doing an ERCP, because that procedure could have complications. Dr. Portes and Leanne agreed that Leanne would call if she had any signs or symptoms, and then Dr. Portes would immediately refer Leanne to a gastroenterologist. For Leanne's muscle soreness, he diagnosed her with a muscle sprain and prescribed Vioxx.

¶ 8      The lab tests were normal, and Leanne was told of those results on February 27, 2001. Leanne reported that she was feeling better. Dr. Portes did not hear from Leanne again.

¶ 9      Leanne's back pain resolved itself after treatment with a chiropractor. In July 2001, she donated one of her kidneys to a friend. In preparation for the donation, she underwent many tests and was evaluated by more than 15 medical professionals. However, she did not have another CT scan of her abdomen.

¶ 10      Leanne felt well until July 2002, when she felt tired and noticed changes in her urine and stool. She saw her gynecologist, Dr. Richard Allen, who ordered blood work. Dr. Allen said that the results were abnormal and immediately referred her to a gastroenterologist, Dr. Perez. Dr. Perez ordered a CT scan, which showed a blockage in her bile duct. He recommended an ERCP, which revealed a tumor. Based on a biopsy of the tumor and her blood test results, he determined that she had pancreatic cancer.

¶ 11     Dr. Perez referred Leanne to Dr. Yale, a surgeon, for a consult. Dr. Yale recommended surgery to remove the cancerous growth and lymph nodes. According to Leanne, it was only after this that she saw the results from the 2001 CT scan for the first time. Leanne had surgery in September 2002. Dr. Yale said that the cancer had metastasized to one of her lymph nodes. He said that she had a 25% chance of surviving five years. After surgery, Leanne had chemotherapy and radiation therapy for six weeks. She was then able to return to work and resume her normal life.

¶ 12     In February 2006, Leanne had fatigue and shortness of breath. Testing revealed terminal cancer in her lung. The cancer was the same type of cancer that was in her pancreas; it had metastasized to her lung. Leanne passed away on March 7, 2007.

¶ 13                                 B. Trial

¶ 14     Witness testimony began on October 12, 2011. We summarize the testimony below.

¶ 15                           1. Dr. Andrew Lowy

¶ 16     Dr. Lowy was a surgical oncologist. He opined for plaintiff that Dr. Huang's description of the 2001 CT scan as showing that the pancreatic duct was dilated up to one centimeter was "very significant," because the duct was four to five times its normal size. The only causes of that condition would be a tumor causing an obstruction, in turn causing the duct to enlarge, or stricture, which is scarring that "narrows the duct and causes it to get enlarged." Stricture could be caused by pancreatitis, which is inflammation of the pancreas, or a congenital defect. Dr. Portes ordered amylase and lipase tests to check for pancreatitis, but those results were normal. Such tests cannot diagnose or rule out pancreatic cancer.

¶ 17     Leanne's 2002 CT scan showed that her pancreatic duct was still markedly dilated. Also, her bile duct and ducts within her liver were now dilated. The type of surgery Leanne underwent, the "Whipple" procedure, was designed to cure the cancer by removing it and the structures around it so that all the cancer cells were removed. Leanne had a cancerous tumor removed from the area of her pancreatic duct. Leanne had chemotherapy and radiation afterward to reduce the risk of recurrence and improve the cure rate by killing undetected cancer cells. In early 2006, Leanne was diagnosed with a recurrence of her pancreatic cancer, in her lung. Cancer cells can travel through the bloodstream and "take up residence in another spot."

¶ 18     Dr. Lowy opined that the cause of the dilation in Leanne's pancreatic duct in 2001 was pancreatic cancer. He believed that, if she had had an ERCP or been referred to a gastroenterologist at that time, the cancer would have been diagnosed. Her treatment at that time would have been the same as it was in 2002.

¶ 19     Dr. Lowy opined that the delay in detecting Leanne's pancreatic cancer from February 2001 to July 2002 was a cause of the recurrence of her cancer in 2006. The delay was therefore also a cause of the medical treatment she received from January 2006 to March 2007 and a cause of the pain, suffering, weakness, lack of appetite, and weight loss she suffered during that time. Further, the delay caused Leanne to lose a chance at a cure of her

cancer and was a cause of her death.

¶ 20 Pancreatic cancer staging refers to categorizing the extent of the disease in a patient. Dr. Lowy identified a document showing five-year survival rates for the cancer, depending on its stage. Five years is the cutoff point because, if a patient were disease-free for five years after treatment, the likelihood that he or she would survive to a natural death would be similar to that of a person who never had cancer.

¶ 21 Dr. Lowy explained that Leanne's cancer was a Stage IIB when it was removed, meaning that it had spread to her lymph nodes. Her five-year survival rate at that point was 6%. He opined that, in February 2001, it was likely a Stage IIA, or a Stage I. If it were a Stage IIA as opposed to a Stage IIB, she would have been twice as likely to be cured, at 12% versus 6%. If it were a Stage IA, she was six times more likely to be cured.

¶ 22 On cross-examination, Dr. Lowy agreed that an ERCP had risks, such as perforation, bleeding, infection, and death. He agreed that the first time Leanne exhibited symptoms of her pancreatic cancer was 17 months after she saw Dr. Portes. Dr. Lowy agreed that the survival rate from pancreatic cancer is poor, with about 23% of patients alive 12 months after diagnosis and only 5% alive after 5 years. The cancer is most often diagnosed after the disease has metastasized, generally precluding any hope for a cure. Dr. Lowy agreed that if Leanne had pancreatic cancer in February 2001, which he believed she did, there was greater than a 50% likelihood that it had already metastasized, and even if she had been treated at that time, it was more likely than not that she would have died from the disease.

¶ 23 On redirect, Dr. Lowy testified that pancreatic cancer is curable. In February 2001, Leanne's cancer would have been at an earlier stage and therefore her chances for a cure would have been greater.

## 2. Dr. Michael Uzer

¶ 25 Dr. Michael Uzer, a gastroenterologist, testified that Dr. Huang's 2001 radiology report described a significant abnormality, that being a "massive" dilation of the entire pancreatic duct, from head to tail. If Leanne had been referred to a reasonable gastroenterologist, he or she would most likely have performed an ERCP, and there would have been a 90% to 95% chance that the tumor would have been discovered. A reasonable gastroenterologist would then have referred Leanne to a surgeon experienced in pancreatic resection for a Whipple operation, just like the treatment Leanne received after her 2002 diagnosis.

¶ 26 Dr. Uzer agreed that there is up to a 10% risk of complications from an ERCP. He further agreed that he had not previously seen a patient who had the same degree of dilation of the pancreatic duct as Leanne and who did not have any other symptoms, problems, or abnormal lab tests. Dr. Uzer agreed that a dilated pancreatic duct could be hereditary or due to stricture.

## 3. Dr. Judith Rubin

¶ 28 Dr. Judith Rubin, a family practice physician, testified that the standard of care is "the care that the patient would receive in the typical doctor's office, the care that 80 percent of doctors would give to that patient." She agreed that, in assessing the standard of care in this

case, she applied the degree of care, knowledge, and skill a reasonably careful family practice physician in Chicago would use in 2001, under like circumstances. The standard of care in Chicago was the same as it was in the rest of the nation.

¶ 29    The cause of a pancreatic duct dilation, like the one seen in Leanne's 2001 CT scan, is like a clog in plumbing that pushes the pressure backward. The cause could be a congenital stricture, a stricture from chronic pancreatitis, a gallbladder stone, or cancer. Leanne's radiology report stated that the pancreatic duct was dilated and that " '[c]orrelation with clinical and laboratory findings is recommended with additional evaluation with ERCP to assess for either stricture or tumor causing this finding.' " A reasonable family practice physician reading the report would equate "tumor" with cancer. The standard of care required Dr. Portes to make an immediate referral to a gastroenterologist to evaluate why the pancreatic duct was three times its normal size and to ensure the earliest possible assessment of any cancer. As Dr. Portes did not make such a referral, he deviated from the standard of care. Even if Dr. Portes's testimony regarding what had happened was true, the standard of care still required him to refer Leanne to a gastroenterologist after he received the normal results of her amylase and lipase test. The standard of care under the circumstances would not allow a reasonable family practice physician to take a "wait and see" approach.

¶ 30    Dr. Rubin did not know of any literature that supported her definition of the standard of care. Dr. Rubin agreed that, other than the dilation, Leanne did not have any signs or symptoms of pancreatic cancer in February 2001. She also agreed that there are potentially severe and life-threatening risks from an ERCP. However, in this case she believed that the benefits of an ERCP would have outweighed the risks.

¶ 31                                    4. Motion for a Directed Verdict

¶ 32    At the close of plaintiff's case, defendants moved for a directed verdict, arguing that: (1) Dr. Rubin evaluated Dr. Portes's conduct under an improper standard of care, because she stated that the standard was what 80% of physicians would do; and (2) plaintiff failed to establish proximate causation between Dr. Portes's conduct and Leanne's death, because Dr. Lowy testified that, even if she had been diagnosed in 2001, Leanne would have had the same treatment she had in 2002 and she still would have ultimately succumbed to the disease. The trial court denied the motion, stating that plaintiff had made a *prima facie* case for proximate cause and that Dr. Rubin had acknowledged the proper standard of care that plaintiff's attorney laid out on direct.

¶ 33                                    5. Dr. Abraham Dachman

¶ 34    Dr. Abraham Dachman, a diagnostic radiologist, testified for the defense as follows. The role of radiologists is to make recommendations, and they do not refer patients or instruct physicians what to do. He was asked to analyze the 2001 CT scan without any other information about the patient. The scan showed a mass in the head of the pancreas. Dr. Dachman later reviewed Dr. Huang's report, and he believed that her statement that there was no discrete mass was inaccurate. To a reasonable degree of medical certainty, he believed that she should have mentioned that the mass was present and visible. However, he

was not offering an opinion on whether Dr. Huang deviated from the standard of care. Further, her report indicated a 50% chance of a tumor causing the widening of the duct.

¶ 35 The mass appearing in the 2001 CT scan was in the same location as the mass in the head of the pancreas visible in the 2002 CT scan. There was not a substantial change in the size of the tumor between the two scans, so from a radiological perspective the disease did not significantly progress, and there was not a difference in the stage of the tumor from 2001 to 2002.

### 6. Dr. William Hulesch

¶ 37 Dr. William Hulesch, a family practice physician, opined that Dr. Portes met the applicable standard of care. Leanne did not have any signs or symptoms of pancreatic cancer in February 2001, her lab tests were normal, and her back pain was not related to the cancer. Dr. Huang's statement that there was no mass in the head of the pancreas was "reassuring," and there could have been benign reasons for the widening of the duct. It was reasonable and within the standard of care for Dr. Portes to talk to Leanne about an ERCP but then take a "wait and see" approach. He advised her to return to the office if she had any problems, but she did not do so. An ERCP was a technically difficult procedure with serious risks. Dr. Hulesch agreed that, if Dr. Portes did not discuss with Leanne the possibility of a pancreatic tumor causing the widening of the duct, it would have been a deviation from the standard of care.

### 7. Dr. Leon Dragon

¶ 39 Dr. Leon Dragon, a medical oncologist, testified on the subject of causation. The mortality rate is 95% or higher for pancreatic cancer, compared to 40% or less for breast cancer. Dr. Dragon opined that Dr. Portes did not cause or contribute to Leanne's pancreatic cancer; to her cancer spreading or metastasizing; to the recurrence of her pancreatic cancer; or to her death from pancreatic cancer.

¶ 40 Dr. Dragon opined that Leanne had cancer in the head of her pancreas "considerably before" 2001. He further opined that it had already metastasized to her lymph nodes by February 2001 and that it was already a Stage IIB at that time. If Leanne had been diagnosed in February 2001, she still would have had to undergo the same treatment she did 17 months later. Dr. Dragon opined that her cancer would still have recurred and she would still have died from the disease. In other words, she did not lose any chance for a cure during those 17 months. He believed that she fell within the 95% of pancreatic cancer patients who die within five years of their diagnoses. Pancreatic cancer is a difficult cancer to treat, and it almost always has already spread by the time of any presentation.

### 8. Dr. Mick Meiselman

¶ 42 Gastroenterologist Dr. Mick Meiselman opined that if a reasonably qualified gastroenterologist had seen Leanne in February 2001, he would not have ordered an ERCP. Leanne was asymptomatic, and the CT scan did not show a mass. The CT scan did show a

dilated pancreatic duct, but a single duct dilation is usually benign and not due to cancer. On the other hand, most patients who have blocks in both their bile and pancreatic ducts have cancer, but that was not shown in the 2001 scan. Moreover, out of all the procedures that a gastroenterologist performs, an ERCP has the most complications and the most serious complications, including death for 1 out of 300 people. Even if an ERCP had been performed in 2001, it would likely have shown just a narrowing of the pancreatic duct. Because Leanne was not showing any cancer signs at the time, the standard practice would have been to "follow it." In contrast, based on the 2002 CT scan showing a mass and the blockage of the bile duct, along with Leanne's symptoms at that time, a reasonably well-qualified gastroenterologist would have performed an ERCP in July 2002.

¶ 43                                9. Dr. Richard Gore

¶ 44       Dr. Richard Gore, a radiologist, testified as a rebuttal witness for plaintiff. He agreed with Dr. Huang that the 2001 CT scan did not show a discrete mass in the head of the pancreas. The only abnormal issue in the area was a dilated duct, which could have been caused by a tumor, chronic pancreatitis, or stricture. Dr. Gore opined that Dr. Huang's radiological report complied with the applicable standard of care. He further agreed with her recommendation for an ERCP, because that was the "gold standard" for diagnostic purposes in 2001.

¶ 45                                   C. Verdict

¶ 46       The jury returned a verdict in favor of plaintiff in the amount of $600,000. Of this amount, $310,000 was awarded for the reasonable costs of the necessary medical care and services that Leanne received.

¶ 47       Defendants timely appealed.

¶ 48                                 II. ANALYSIS
¶ 49                              A. Standard of Care
¶ 50       Defendants first argue that the trial court erred in denying their motion for a directed verdict and their motion for judgment notwithstanding the verdict (judgment *n.o.v.*), because plaintiff's only standard-of-care expert, Dr. Rubin, relied upon an incorrect standard of care in formulating her opinions.

¶ 51       In a medical malpractice action, the plaintiff must prove the following elements: (1) the proper standard of care against which the defendant physician's conduct is measured; (2) an unskilled or negligent failure to comply with that standard; and (3) a resulting injury proximately caused by the physician's want of skill or care. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). In order for an expert to be competent to testify about the standard of care in a particular case, he or she must be licensed in the defendant's school of medicine and be able to show that he or she is familiar with the methods, procedures, and treatments ordinarily observed by other physicians in the defendant's community or in a similar community. *Id.* at 112-13.

¶ 52	When asked at trial to describe the term "standard of care," Dr. Rubin stated that it was "the care the patient would receive in the typical doctor's office, the care that 80 percent of doctors would give to the patient." The following questioning then took place:

"Q. In looking at the issues in this case, when assessing the standard of care, did you apply the degree of care, knowledge and skill that a reasonably careful family practice physician would use in Chicago in 2001 in like or similar circumstances?

A. Yes.

Q. And are you familiar with the standard of care for reasonably careful family practice physicians as that standard existed in Chicago in the year 2001?

A. I believe that the standard of care is the same in Chicago as it is in the rest of the United States. Our board certification is national, and it is a national standard of care.

Q. So yes?

A. Yes.

Q. When I ask you questions today that use the term standard of care, I mean that degree of care, knowledge and skill that a reasonably careful physician would use under like or similar circumstances in the year 2001. Do you understand?

A. I understand.

Q. Your opinions here must be stated to a reasonable degree of medical certainty. If I ask you for an opinion and you have one, are we understood that opinion will be stated to that degree of certainty unless you tell me otherwise?

A. Yes."

¶ 53	On cross-examination, Dr. Rubin stated that her understanding of the standard of care was "[w]hat 80 percent of doctors would do."

¶ 54	A trial court should grant a directed verdict or judgment *n.o.v.* only where all the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based on the evidence could ever stand. *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 100 (2010). We review *de novo* the denial of a motion for judgment *n.o.v.* or the denial of a motion for a directed verdict. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. Although such motions are made at different stages of the trial, they raise the same questions and are governed by the same rules of law. *Id.* A trial court may not enter a directed verdict or judgment *n.o.v.* if there is *any evidence*, together with reasonable inferences drawn from the evidence, demonstrating a substantial factual dispute, or if the assessment of witness credibility or the determination regarding conflicting evidence is decisive to the outcome. *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 26.

¶ 55	Here, as Dr. Rubin testified that she applied the degree of care, knowledge, and skill that a reasonably careful family practice physician would use in similar circumstances, plaintiff presented some evidence on the applicable standard of care. Dr. Rubin's additional references to the standard as what 80% of physicians would do was, at most, conflicting evidence that could have borne on her credibility. As such, these statements alone could not serve as the basis for a directed verdict or judgment *n.o.v.* See also *Taylor v. County of Cook*,

-9-

2011 IL App (1st) 093085, ¶ 33 (although expert witness's definition of the term "standard of care" in his deposition did not comply verbatim with the Illinois Pattern Jury Instruction on the issue, it did not render his otherwise reliable testimony unreliable); *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 865 (2008) (the trial court erred in directing a verdict based on a witness's inaccurate testimony regarding the applicable standard of care, because the jury heard other evidence of the proper standard of care).

¶ 56       Defendants alternatively argue that, because Dr. Rubin testified to inconsistent standards of care, her opinions were not of sufficient weight or competence to support the verdict entered in plaintiff's favor. Defendants argue that they are entitled to a new trial on this basis.

¶ 57       A trial court should grant a motion for a new trial if the verdict is contrary to the manifest weight of the evidence. *Lawlor*, 2012 IL 112530, ¶ 38. That occurs where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on any of the evidence. *Id.* We will reverse a trial court's ruling on a motion for a new trial only if the trial court abused its discretion. *Id.*

¶ 58       In this case, we cannot say that the trial court's denial of defendants' request for a new trial was an abuse of discretion. It is the jury's province to resolve conflicts in the evidence, determine witnesses' credibility, and decide the weight to give to witnesses' testimony. *Stapleton v. Moore*, 403 Ill. App. 3d 147, 165 (2010). Here, Dr. Rubin testified that she used the applicable standard of care in assessing Dr. Portes's actions. Moreover, the jury heard the applicable standard of care through other witnesses, and it was given a legal definition in the jury instructions. As stated, Dr. Rubin's testimony regarding the standard of care as what 80% of doctors would do was a conflict in the testimony for the jury to resolve. The defense was able to highlight the inconsistency in its cross-examination of Dr. Rubin; in its direct examination of Dr. Hulesch; and in its closing argument. Still, considering *all* of Dr. Rubin's testimony, along with the testimony of the other witnesses, the jury's finding that plaintiff proved that Dr. Portes breached his standard of care was not unreasonable or arbitrary and was based on the evidence.

¶ 59                                    B. Proximate Causation

¶ 60       Defendants' second argument on appeal is that the trial court erred in denying their motion for a directed verdict based on plaintiff's failure to establish a proximate causal link between Dr. Portes's alleged deviations from the standard of care and Leanne's death from pancreatic cancer.

¶ 61       As previously mentioned, one of the elements of a medical malpractice action is an injury proximately caused by the physician's lack of skill or care. *Sullivan*, 209 Ill. 2d at 112. A plaintiff must prove that the defendant's negligence " 'more probably than not' " caused the plaintiff's injury. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997). Plaintiff in this case pursued the "lost chance" doctrine. This doctrine "refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Id.* at 111. In *Holton*, our supreme court stated, "To the extent a plaintiff's chance

of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Id.* at 119. Plaintiffs are not required to prove that they would have had a greater than 50% chance of survival or recovery absent the alleged malpractice. *Id.*

¶ 62    Defendants argue that, under the lost chance doctrine, plaintiff had to prove that Leanne had a chance to survive when she first saw Dr. Portes and that defendants' negligence deprived her of that chance of survival. Defendants argue that plaintiff did not offer such proof because his own expert, Dr. Lowy, admitted that when Leanne first saw Dr. Portes her pancreatic cancer had probably already metastasized, was incurable, and would cause her death, regardless of any efforts undertaken by defendants. Defendants argue that Dr. Lowy testified that, if Leanne had a Stage IIB tumor in February 2001, she would have had a 6% chance of surviving for five years, but he conceded that it was impossible to say whether she actually had a Stage IIB tumor at that point. Defendants maintain that if, as conceded by Dr. Lowy, they could not have done anything that would have changed the course of treatment or the outcome, the element of proximate causation cannot be established.

¶ 63    A trial court should grant a directed verdict for the defense only where the plaintiff has failed to establish a *prima facie* case. See *Sullivan*, 209 Ill. 2d at 123. A *prima facie* case is established by presenting some evidence on every essential element of the cause of action. *Davis v. Kraff*, 405 Ill. App. 3d 20, 31 (2010).

¶ 64    Here, Dr. Lowy opined that the delay in diagnosing Leanne's cancer from February 2001 to July 2002 was a cause of the recurrence of her pancreatic cancer and a cause of her death. He testified that, when Leanne's cancer was removed, it was Stage IIB, giving her a 6% chance of a five-year survival. He stated that, while it was "impossible to say" with "certainty" at what stage her cancer was in February 2001, to a reasonable degree of medical certainty it was likely a Stage IIA in February 2001, and it could have been a Stage I. If it was a Stage IIA, she was twice as likely to be cured as she would if it were a Stage IIB, and if it was a Stage I, she was six times more likely to be cured than if it were a Stage IIB. Therefore, plaintiff presented some evidence that Dr. Portes's alleged negligence, which resulted in Leanne not being diagnosed with cancer in February 2001, decreased her chances of recovering from the disease.

¶ 65    We recognize that on cross-examination Dr. Lowy agreed that if Leanne had pancreatic cancer in February 2001, which he believed she did, the likelihood that it had already metastasized was greater than 50%, and even if she had been treated at that time, it was more likely than not that she still would have died from the disease. This testimony is consistent with his testimony on direct, as a 12% five-year survival rate for a Stage IIA cancer and a 36% five-year survival rate for a Stage I cancer still means that the patient is more likely than not, or is more than 50% likely, to die from the disease. However, under *Holton*, plaintiff was not required to prove that Leanne would have had a greater than 50% chance of survival or recovery absent the alleged malpractice. *Holton*, 176 Ill. 2d at 119. Rather, plaintiff had to present some evidence that the alleged negligence proximately caused the increased risk of harm or lost chance of recovery to a reasonable degree of medical certainty (*id.*), and plaintiff did so through Dr. Lowy's testimony that Leanne was two to six times more likely to survive

-11-

five years (and thereafter live to a natural death) had she been diagnosed in February 2001 as opposed to July 2002.

¶ 66    Defendants alternatively argue that plaintiff's evidence of the causal link was not sufficient to support the verdict, so they are entitled to a new trial. This argument is without merit. Dr. Uzer testified that, had Leanne been referred to a reasonable gastroenterologist in February 2001, that doctor most likely would have performed an ERCP and there would have been a 90% to 95% chance that the tumor would have been discovered. He opined that a reasonable gastroenterologist would then have referred her for surgery. As discussed, Dr. Lowy testified that Leanne would have had a greater chance of recovery had she been diagnosed and treated in February 2001, because he believed that her cancer was at an earlier stage at that time. The defense provided its own expert witnesses: Dr. Dachman testified that the tumor was visible in the 2001 CT scan and did not grow any significant amount between February 2001 and July 2002; Dr. Meiselman testified that a reasonable gastroenterologist would not have performed an ERCP in February 2001, and even if that doctor did, the procedure would not have shown the tumor; and Dr. Dragon testified that Leanne did not lose any chance for a cure during the 17-month period. The jury was faced with a classic battle of the experts, and the battle was for the jury, as the trier of fact, to resolve. See *Davis*, 405 Ill. App. 3d at 37-38. Considering all of the evidence, the jury's determination that plaintiff met his burden of proving proximate causation was not contrary to the manifest weight of the evidence. Therefore, the trial court did not abuse its discretion in denying defendants' motion for a new trial.

¶ 67                                    C. Jury Instruction

¶ 68    Defendants next argue that the trial court committed reversible error in giving the jury an improper standard-of-care instruction. The trial court provided an instruction for professional negligence that was based on Illinois Pattern Jury Instructions, Civil, No. 105.01 (2011) (hereinafter, IPI Civil (2011) No. 105.01). The instruction stated:

    "A family practice physician must possess and use the knowledge, skill, and care ordinarily used by a *reasonably careful* family practice physician. The failure to do something that a *reasonably careful* family physician would do, or the doing of something that a *reasonably careful* family physician would not do, under circumstances similar to those shown by the evidence, is 'professional negligence.'

    The phrase 'deviation from the standard of care' means the same thing as 'professional negligence.'

    The law does not say how a reasonably careful family practice physician would act under these circumstances. That is for you to decide. In reaching your decision, you must rely on opinion testimony from qualified witnesses. You must not attempt to determine how a reasonably careful family practice physician would act from any personal knowledge you may have." (Emphases added.)

The instruction defendants submitted, and which the trial court rejected, was identical except that it used the phrase "reasonably well qualified" in place of "reasonably careful."

¶ 69    Jury instructions should inform the jurors of the issues presented, the principles of law

-12-

to be applied, and the facts needed to be proved in support of a verdict. *Howat v. Donelson*, 305 Ill. App. 3d 183, 186 (1999). The trial court must instruct the jury using an Illinois Pattern Jury Instruction (IPI) unless it determines that the instruction does not accurately state the law. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 14 (citing Ill. S. Ct. R. 239(a) (eff. Jan. 1, 1999)). It is within the trial court's discretion to grant or deny a particular jury instruction. *Id.* ¶ 13. " 'The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law.' " *Id.* (quoting *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002)). Still, if the issue is whether a jury instruction accurately conveyed the applicable law, the issue is a question of law, subject to *de novo* review. *Id.* A reviewing court will not grant a new trial based on a trial court's refusal to provide a suggested jury instruction unless the refusal seriously prejudiced the complaining party's right to a fair trial. *Surestaff, Inc. v. Azteca Foods, Inc.*, 374 Ill. App. 3d 625, 627 (2007).

¶ 70       Defendants argue that the jury instruction did not correctly state the law; our review of this issue is therefore *de novo*.

¶ 71       Defendants cite *Studt*, 2011 IL 108182. There, in determining whether IPI Civil (2006) No. 105.01 provided the proper standard of care in professional negligence cases, our supreme court compared the 2006 version of the instruction with the 2005 version, stating as follows:

> "While the 2005 version states that the professional 'must possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified [professional]' (IPI Civil (2005) No. 105.01), the 2006 version states that professional negligence 'is the failure to do something that a reasonably careful [professional] would do, or the doing of something that a reasonably careful [professional] would not do, under circumstances similar to those shown by the evidence' (IPI Civil (2006) No. 105.01)." *Id.* ¶ 33.

The supreme court stated that a professional must exercise the skill that is a special form of competence that results from acquired learning and aptitude developed by training and experience. *Id.* ¶ 34. The court stated that the 2006 version of the instruction was "incomplete because it contains no reference to the professional's knowledge, skill, and care (or knowledge, skill, and ability) and, therefore, does not accurately state Illinois law as to the standard of care applicable in professional negligence actions." *Id.*

¶ 72       Defendants argue that under *Studt*, the trial court erred in giving the jury the 2006 version of the jury instruction. Defendants argue that instead of directing the jury to evaluate defendants' conduct in light of what a reasonably well-qualified physician would do, which is the standard under which defendants should have been evaluated, the instruction improperly directed the jury to evaluate defendants in light of what a reasonably careful physician would do.

¶ 73       Although defendants repeatedly assert that the trial court gave the jury the 2006 version of the jury instruction, it is clear that the trial court instructed the jury using the 2011 version of the instruction. The instruction's "Notes on Use" and "Comment" sections indicate that the instruction was amended to conform to *Studt*. IPI Civil (2011) No. 105.01, Notes on Use

-13-

(rev. Sept. 2011), Comment (rev. Dec. 2011). As mentioned, the supreme court in *Studt* stated that the 2006 version of the instruction was incomplete because it did not refer to the professional's knowledge, skill, and care/ability. *Studt*, 2011 IL 108182, ¶ 34. However, the 2011 version of the instruction *does* refer to the professional's "knowledge, skill, and care," thereby remedying this deficiency. IPI Civil (2011) No. 105.01.

¶ 74　　　Defendants are correct that the jury instruction given still referred to what a "reasonably careful" physician would do (see IPI Civil (2011) No. 105.01), whereas the 2005 version of the instruction referred to what a "reasonably well-qualified" professional would do (IPI Civil (2005) No. 105.01). However, in *Loman v. Freeman*, 229 Ill. 2d 104 (2008), the supreme court quoted *Advincula v. United Blood Services*, 176 Ill. 2d 1 (1996), for the proposition that "the standard of care for all professionals is 'the use of the same degree of knowledge, skill and ability as an ordinarily *careful* professional would exercise under similar circumstances.' " (Emphasis added.) *Loman*, 229 Ill. 2d at 119 (quoting *Advincula*, 176 Ill. 2d at 23). In *Studt*, the supreme court referred to these cases with approval (*Studt*, 2011 IL 108182, ¶ 34), and the *Studt* court did not reject the use of "reasonably careful" in the 2006 version of the instruction. Moreover, the appellate court has directly held that the phrase "reasonably careful" correctly replaces "reasonably well-qualified" in the instruction. *Matarese v. Buka*, 386 Ill. App. 3d 176, 184-85 (2008); *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 816-17 (2008). Accordingly, we conclude that IPI Civil (2011) No. 105.01 correctly states the law on professional negligence, and the trial court did not err in instructing the jury using this version.

¶ 75　　　　　　　　　　　　　　　D. Section 2-1205

¶ 76　　　Last, defendants argue that under section 2-1205 they were entitled to a reduction of the judgment in an amount equal to 100% of the medical benefits "which have been paid, or which have become payable to the injured person by any *** insurance company or fund in relation to a particular injury." 735 ILCS 5/2-1205 (West 2010). Defendants maintain that the trial court erroneously refused to give effect to their rights under the statute.

¶ 77　　　Section 2-1205 provides, in its entirety, as follows:

"Reduction in amount of recovery. An amount equal to the sum of (i) 50% of the benefits provided for lost wages or private or governmental disability income programs, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, and (ii) 100% of the benefits provided for medical charges, hospital charges, or nursing or caretaking charges, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, shall be deducted from any judgment in an action to recover for that injury based on an allegation of negligence or other wrongful act, not including intentional torts, on the part of a licensed hospital or physician; provided, however, that:

(1) Application is made within 30 days to reduce the judgment;

(2) Such reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise;

-14-

"(3) The reduction shall not reduce the judgment by more than 50% of the total amount of the judgment entered on the verdict;

(4) The damages awarded shall be increased by the amount of any insurance premiums or the direct costs paid by the plaintiff for such benefits in the 2 years prior to plaintiff's injury or death or to be paid by the plaintiff in the future for such benefits; and

(5) There shall be no reduction for charges paid for medical expenses which were directly attributable to the adjudged negligent acts or omissions of the defendants found liable." *Id.*

¶ 78                              1. Procedural Background on This Issue

¶ 79     The judgment was entered on October 20, 2011. Of the $600,000 total judgment, $310,000 was awarded for the reasonable costs of Leanne's medical care and services.

¶ 80     On October 21, 2011, defendants filed their motion to reduce the judgment pursuant to section 2-1205. In their motion, defendants noted that, in his answer to defendants' interrogatories, plaintiff stated that the medical expenses were paid by his insurance carrier. Defendants further stated that they had not been put on notice of any right of recoupment of the medical expenses through subrogation, lien, or otherwise. Defendants sought a reduction of $300,000 for medical expenses, as section 2-1205 limited the reduction to 50% of the gross judgment.

¶ 81     In his response to the motion, plaintiff argued that a statutory reduction did not apply, because there was a right of recoupment. Plaintiff included an affidavit in which he stated that an attached "Reimbursement Provision" was part of his health insurance policy. The provision stated in relevant part:

     "Blue Cross and Blue Shield has the right to reimbursement for all benefits Blue Cross and Blue Shield provided from any and all damages collected from the third party for those same expenses whether by action at law, settlement, or compromise, by you or your legal representative as a result of that sickness or injury, in the amount of the total Eligible Charge or Provider's Claim Charge for Covered Services for which Blue Cross and Blue Shield has provided benefits to you, reduced by any Average Discount Percentage ('ADP') applicable to your Claim or Claims."

In plaintiff's response, he also attached a letter from BlueCross BlueShield of Illinois (BCBS), which stated that his health plan included a "reimbursement and/or subrogation provision" and that the "total amount of benefits provided as of [November 2, 2011,] was $134,933.85."

¶ 82     Defendants filed a reply in support of their motion, stating that plaintiff had identified the BCBS lien for the first time. They stated that, based on plaintiff's admission that the lien was limited to $134,933.85, they were amending their request and asking that the trial court reduce the judgment by $175,066.15 (*i.e.*, $310,000-$134,933.85).

¶ 83     In a surresponse, plaintiff cited *York v. El-Ganzouri*, 353 Ill. App. 3d 1 (2004), for the proposition that, under section 2-1205, the right of recoupment, rather than the perfection of that right, bars setoff.

-15-

¶ 84    Defendants argued in a surreply that *York* was distinguishable because the defendant there did not meet its burden of showing the amount of medical expenses paid or the amount of the lien. Defendants argued that, in contrast, they relied on plaintiff's admissions and answers to interrogatories to show that all medical expenses were paid by insurance, and they amended their request in response to BCBS documents plaintiff subsequently provided.

¶ 85    On November 22, 2011, the trial court entered an order stating that it had "offered to the parties the right to submit additional evidence" but that the parties had rejected that offer. The trial court denied defendants' motion to reduce the judgment, reasoning that: (1) the statute's plain language allowed a reduction of only any amount paid by a third-party insurer; (2) the evidence submitted showed that the insurer actually paid $134,933.85; (3) section 2-1205 barred "any request where there is a right of reimbursement"; and (4) the evidence of a right of reimbursement in this case barred defendants' request to reduce the judgment.

¶ 86    On December 20, 2011, defendants filed a motion requesting additional time in which to file a motion to reconsider the denial of the motion to reduce the judgment. They maintained that they had learned that the BCBS lien was not $134,933.85, as represented by plaintiff's attorney, but rather it had been reduced by one-third of that amount. Defendants further represented that they had served a subpoena on BCBS for all records related to the amount it paid and the amount of reimbursement.

¶ 87    The same day, the trial court granted the motion for additional time and gave defendants leave to pursue expedited discovery related to the motion to reduce the judgment.

¶ 88    Defendants filed their motion to reconsider on January 6, 2012. They stated as pertinent here that, although BCBS did not fully comply with their subpoena, documents it produced confirmed that the amount of its lien was one-third less than $134,933.85. Defendants also stated that the documents showed that plaintiff's attorney had told the insurer not to cooperate with them. Defendants requested that the trial court order BCBS to produce "Health Plan documents."

¶ 89    On January 10, 2012, the trial court ordered BCBS to comply with defendants' subpoena and granted leave for defendants to supplement their motion to reconsider. In their supplemental brief, defendants attached documents showing that the charges submitted to BCBS totaled $358,712.71 (at trial, the parties stipulated that the medical bills were $310,000) and that the amount paid by BCBS was "$134,604.85." A document also stated that BCBS had "agreed to reduce [its] lien by 1/3 to share in attorney's fees and in addition will consider a pro-rata share of reasonable case expenses incurred by plaintiff's counsel."

¶ 90    On February 14, 2012, the trial court granted plaintiff's motion to strike the material produced by BCBS, stating that defendants did not meet their burden of showing that the newly discovered evidence was not available at the time of the original hearing. It also denied defendants' motion to reconsider.

¶ 91                        2. Arguments and Applicable Law

¶ 92    Defendants maintain that rulings under section 2-1205 should be reviewed *de novo* because the statute does not vest the trial court with the discretion to deny a reduction of a judgment if the statutory conditions are met. While we need not go so far as to state that all

section 2-1205 rulings must be reviewed *de novo*, we agree that in this case the trial court made its ruling based on its interpretation of the statute. Statutory construction is a question of law, which we review *de novo*. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 21. Correspondingly, the question of the correctness of the trial court's statutory interpretation is reviewed *de novo*. *People v. Pieper*, 379 Ill. App. 3d 205, 208 (2008); see also *Kalbfleisch v. Columbia Community Unit School No. 4*, 396 Ill. App. 3d 1105, 1112 (2009) (where trial court's ruling on whether to grant a preliminary injunction involves the interpretation of a statute, the appropriate standard of review is *de novo*). Accordingly, we apply *de novo* review here.

¶ 93        Section 2-1205 represents an exception to the collateral source rule and allows a medical malpractice judgment to be reduced by the medical charges associated with the claim. *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 481 (1996). Section 2-1205 was enacted to reduce the costs of malpractice actions by eliminating duplicative recoveries. *DeCastris v. Gutta*, 237 Ill. App. 3d 168, 175 (1992).

¶ 94                    a. Whether the Medical Expenses Were "Directly Attributable"
                                 to the Negligence

¶ 95        Defendants argue that, of section 2-1205's five conditions, only one is in dispute, that being the insurer's right of recoupment. Noting that we may affirm on any basis provided by the record, regardless of the trial court's reasoning (*Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 62), plaintiff argues in his brief that subsection 2-1205(5) of the statute applies. That portion of the statute states: "There shall be no reduction for charges paid for medical expenses which were directly attributable to the adjudged negligent acts or omissions of the defendants found liable." 735 ILCS 5/2-1205(5) (West 2010). However, at oral argument plaintiff withdrew his assertion that this subsection applies. Therefore, we do not address it further.

¶ 96                    b. Whether BCBS Has a Right of Recoupment Against Plaintiff

¶ 97        Defendants argue that the judgment should be reduced by $300,000 under subsection 2-1205(2) because BCBS has no right of recoupment against plaintiff. Subsection 2-1205(2) states: "Such reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise." 735 ILCS 5/2-1205(2) (West 2010). Defendants argue that persons who receive benefits under a health insurance policy agree to be bound by its terms, and although plaintiff is a member of the BCBS health insurance plan, he is not individually a party to this action and is not the recipient of the judgment. Rather, he is a plaintiff only in his capacity as the administrator of Leanne's estate. Defendants maintain that BCBS has no contract with plaintiff and therefore no right of recoupment against plaintiff.

¶ 98        Plaintiff argues that he is not a stranger to the health insurance contract, as he provided evidence that he was the primary holder of the policy, and Leanne was the beneficiary. Plaintiff further argues that accepting defendants' legal premise here would practically eviscerate any recovery in a medical malpractice action where a physician's negligence

-17-

causes the victim's death, or where the victim passes away before its final resolution. Plaintiff contends that the legislature could not have intended this result.

¶ 99 A wrongful death claim (which asserts on behalf of family a claim that the decedent's death resulted from a wrongful act, neglect, or default) and a survival action (which asserts a claim for any action that would otherwise have been possessed by the decedent) must be brought by and in the name of the representative or administrator of the decedent's estate. *Will v. Northwestern University*, 378 Ill. App. 3d 280, 289 (2007). A wrongful death action is grounded in the defendant's wrongful act, whether it was prosecuted by the decedent during his lifetime or by a representative of the estate. *Williams v. Manchester*, 228 Ill. 2d 404, 426 (2008). It is derived from the decedent's cause of action and is "limited to" what the decedent's cause of action would have been if the decedent were alive. *Id.* at 422. As Leanne's cause of action was limited by the reduction provision in section 2-1205, it follows that her estate's claim was similarly limited. As plaintiff points out, a contrary interpretation would violate the presumption in statutory construction that the legislature did not intend absurd or unjust results. See *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 78 (we construe a statute with the presumption that the legislature did not intend absurd, inconvenient, or unjust results). Further, in this case the health insurance policy provided BCBS with the contractual right to reimbursement for damages collected by the insured or the insured's "legal representative." Accordingly, defendants' argument is without merit.

¶ 100 c. Trial Court's Refusal to Consider BCBS Documents

¶ 101 Defendants alternatively argue that the section 2-1205 analysis should be governed by BCBS's calculation that its right to recoupment equals two-thirds of the amount that it actually paid toward Leanne's medical bills. Defendants argue that, by BCBS's own accounting, the amount BCBS actually paid was $134,604.85, and BCBS calculated its right to recoupment as $89,736.56. Defendants argue that they are therefore entitled to a $210,263.44 reduction in the judgment ($300,000-$89,736.56).

¶ 102 Although defendants rely on BCBS documents for these calculations, the trial court ultimately struck these materials. As such, we must first address defendants' argument that the trial court abused its decision in striking this evidence and in denying their motion to reconsider.

¶ 103 A motion to reconsider is meant to bring to the trial court's attention newly discovered evidence not previously available, changes in the law, or errors in the trial court's application of existing law. *In re Marriage of Epting*, 2012 IL App (1st) 113727, ¶ 41. A ruling on a motion to reconsider is reviewed for an abuse of discretion. *Id.* ¶ 33. Similarly, the admission of evidence is within the trial court's sound discretion. *Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1179 (2011).

¶ 104 Defendants argue that they were unable to present the trial court with all of the relevant evidence when they filed their motion to reduce the judgment, because plaintiff's attorney told BCBS not to cooperate with defendants' efforts to obtain evidence relating to what the insurer paid and would seek as recoupment. Defendants argue that BCBS failed to comply with the subpoena defendants issued until the trial court specifically ordered it to comply,

-18-

which was after the trial court had denied the motion to reduce the judgment. Defendants maintain that, once they gained access to the evidence, they were able to show that BCBS was actually seeking to recoup no more than two-thirds of $134,933.85, contrary to plaintiff's attorney's representation to the court. Defendants maintain that they were also able to show that the BCBS plan eliminated any right to recover amounts not paid by BCBS with respect to services provided by BCBS participating providers.

¶ 105   Defendants argue that the trial court's order striking the BCBS materials was also inconsistent with its December 20, 2011, order granting them leave to conduct further discovery and leave to file a motion to reconsider the denial of the motion to reduce the judgment. Defendants contend that plaintiff waived any objection to the timeliness of their presentation of new evidence when he not only failed to object but agreed to allow defendants to conduct further discovery.

¶ 106   Plaintiff argues that defendants cannot contest the trial court's striking of materials and denial of the motion to reconsider, because defendants did not provide a report of proceedings from that hearing. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (the appellant has the burden to provide a sufficiently complete record of trial proceedings to support his claims of error, and the reviewing court will resolve any doubts that arise from the incompleteness of the record against him). This argument is not well taken, as the report of proceedings from the relevant hearing *is* in the record.

¶ 107   Plaintiff argues that defendants' argument regarding "inconsistent" rulings ignores the fact, as memorialized by the trial court's November 22, 2011, order, that defendants rejected the trial court's invitation to submit additional evidence. Plaintiff argues that, even if there was some inconsistency in the trial court's rulings, a court may modify an interlocutory order like the one of December 20, 2011, at any time. See *Richichi v. City of Chicago*, 49 Ill. App. 2d 320, 325 (1964) (an interlocutory order may be modified or vacated at any time).

¶ 108   We conclude that the trial court acted within its discretion in striking the BCBS materials and denying the motion to reconsider, to the extent that the motion relied on the new evidence. Defendants did not attempt to subpoena any evidence from BCBS until after the trial court denied their motion to reduce the judgment. Therefore, the BCBS materials defendants subsequently obtained would have had to qualify as newly discovered evidence in order for the trial court to consider them. Newly discovered evidence is evidence that was not available at the time of the first hearing. *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 104. Here, defendants made no showing that the evidence they later obtained was not available at the original hearing on the motion to reduce the judgment. In fact, as plaintiff notes, at that time the trial court expressly offered the parties the right to submit additional evidence, but both parties declined. The trial court's ruling striking the evidence conformed with the principle that "[t]rial courts should not permit litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling." *Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248 (1991). That the trial court allowed defendants to conduct additional discovery after the denial of the motion does not change the result, as it would not have known at the time whether defendants would obtain new evidence that was not previously available. Even otherwise, as plaintiff points out, the trial court had the authority to revise its prior ruling.

-19-

Although defendants argue that plaintiff misrepresented the evidence, they did not assert fraud or similar grounds. Accordingly, the trial court acted within its discretion in refusing to consider the materials, and we likewise do not consider them on appeal.[1] As such, we do not address defendants' arguments that BCBS is seeking to recover only two-thirds of the amount that it paid for medical expenses (*i.e.*, $89,736.56).

¶ 109       d. Whether Any Right to Recoupment Bars a Reduction in the Judgment

¶ 110      In denying defendants' motion to reduce the judgment under section 2-1205, the trial court stated that there was a right of reimbursement in this case and that the statute barred "any request where there is a right of reimbursement." Plaintiff maintains that the trial court correctly found that, where there is a right to reimbursement by a medical care provider, there is no right to reduce. Defendants argue that such an interpretation is contrary to the statute's plain language, which states: "Such reduction shall not apply *to the extent that* there is a right of recoupment through subrogation, trust agreement, lien, or otherwise." (Emphasis added.) 735 ILCS 5/2-1205(2) (West 2010).

¶ 111      In construing a statute, our primary goal is to ascertain and give effect to the legislature's intent. *Mashal*, 2012 IL 112341, ¶ 21. The best indication of that intent is the statute's language when given its plain and ordinary meaning. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. Where the statute's language is clear and unambiguous, we must apply it without resorting to other statutory construction aids. *Id.* As stated, statutory construction is a question of law, which we review *de novo. Mashal*, 2012 IL 112341, ¶ 21.

¶ 112      Here, plaintiff's interpretation of the statute would be correct if the statute stated "Such reduction shall not apply *if* there is a right of recoupment." However, given that the statute says that the reduction shall not apply "to the extent that" there is a right of recoupment, we agree that this language limits the reduction by only the extent of, or amount of, the right to recoupment. Plaintiff's interpretation ignores the "to the extent that" language, rendering the phrase superfluous, and we must construe a statute in a manner that renders no term or phrase superfluous. *Prazen v. Shoop*, 2012 IL App (4th) 120048, ¶ 35. Moreover, plaintiff's interpretation, which would disallow any reduction even if the insurer had a right to recoup one cent, runs counter to section 2-1205's purpose of reducing the costs of medical malpractice actions by eliminating duplicative recoveries. See *DeCastris*, 237 Ill. App. 3d at 175. In contrast, the plain language of the statute advances this goal while still not subjecting the plaintiff to an uncompensated loss for medical expenses if an insurer exercises its right to recover medical payments.

¶ 113      Our analysis of the phrase "to the extent that" is consistent with the analysis applied by the Oregon appellate court in *Oregon Account Systems, Inc. v. Greer*, 996 P.2d 1025 (Or. Ct. App. 2000) (*en banc*). There, the court analyzed a claim based on the Oregon Uniform

---

[1]Defendants also argue that, even if it was within the trial court's discretion to refuse to consider the new evidence, there was no arguable basis for striking the materials from the record. As we are able to view the disputed evidence in the record here, the distinction has no practical effect.

Fraudulent Transfer Act (Act) (Or. Rev. Stat. § 95.230). *Greer*, 996 P.2d at 1026. To state a claim under the Act, a plaintiff had to allege the conveyance of property that constituted a transfer of an asset. *Id.* at 1027. "Asset" was defined as the debtor's property but excluded, *inter alia*, " '[p]roperty *to the extent that* it is encumbered by a valid lien.' " (Emphasis added.) *Id.* (quoting Or. Rev. Stat. § 95.200(2)(a)). The plaintiff argued that the subject real property was excluded from being an asset under the Act only "to the extent" that it was encumbered by a lien, with "to the extent" meaning the value of the lien; the plaintiff maintained that the value of the equity in the property exceeding the lien amount was still an asset. *Id.* at 1028. The defendants took the position that the phrase "to the extent" referred to the type of lien on a property rather than to the amount of the lien. *Id.* Therefore, according to the defendants, the fact that the property had a lien on it caused the entire property to be encumbered and exempt. *Id.*

¶ 114    The Oregon court agreed with the plaintiff's position. Like in our discussion, the Oregon court stated that, looking at the phrase "to the extent" in context, the defendant's interpretation would render the phrase superfluous, as the legislature could have stated that property "that is" encumbered by a valid lien is exempt. *Id.* at 1029. The court stated that the statute required it to measure the extent of the lien encumbering the property and that liens were generally measured by their pecuniary value. *Id.* Therefore, exempt from being an "asset" under the Act was the value of the property up to the amount of valid liens encumbering it, with equity exceeding that amount being an asset under the Act. *Id.* Similarly, here the reduction is limited to the amount of the right of recoupment, with the value exceeding that amount subject to reduction.

¶ 115    Plaintiff's reliance on *York* for a contrary outcome is not persuasive. In *York*, the court held that the defendant did not meet his burden of proving that the insurer did not have a right of recoupment, because the record did not contain any evidence of what medical expenses the insurer paid, much less what recoupment rights it retained. *York*, 353 Ill. App. 3d at 22-23. Here, in contrast, the record does contain such evidence. The defendant in *York* also argued that, because the plaintiff did not show any proof of insurers' liens against the judgment, the defendant was entitled to deduct the entire amount of the past medical expenses awarded in the judgment. *Id.* at 22. The appellate court disagreed, stating that "it is only the *right* of recoupment, *not the perfection of that right* that bars setoff." (Emphases in original.) *Id.* We agree with the *York* court that it is the right of recoupment that controls, rather than the perfection of that right. While plaintiff here would like to extend *York*'s holding to encompass a right of recoupment as prohibiting any setoff, this issue was simply not before the *York* court. That is, the *York* court did not discuss the meaning of "to the extent that" in section 2-1205.

¶ 116    We have found only one Illinois case, *Share Health Plan of Illinois, Inc. v. Alderson*, 285 Ill. App. 3d 489 (1996), interpreting the phrase "to the extent that." There, Ruth Alderson, a Medicare recipient, received a general settlement for a tort claim. *Id.* at 491. The health maintenance organization (HMO) that administered Alderson's Medicare benefits sought to recover from Alderson the medical expenses that it had paid on her behalf. *Id.* at 492. Alderson cited a federal regulation stating that an HMO could charge an enrollee for covered services " 'to the extent that he or she has been paid by the carrier, employer, or other

entity.' " *Id.* at 494 (quoting 42 C.F.R. § 417.528(b)(2) (1995)). Alderson argued that the regulation meant that the HMO could recover just the portion of the settlement that was specifically designated to it. *Id.* The appellate court disagreed, interpreting the phrase "to the extent that" to mean that the HMO could recover up to the amount of the settlement, but not more. *Id.* The court stated, "We decline to hold otherwise because doing so would be inconsistent with the overall scheme of the Medicare Secondary Payer statute." *Id.*

¶ 117     If anything, *Share Health Plan* supports our result here, as the court interpreted the phrase "to the extent that" as referring to a monetary limit, just as we have interpreted the phrase as limiting reduction of a judgment to the dollar amount of the right of recoupment. Moreover, the *Share Health Plan* court took into account the legislative intent of the statutory scheme in arriving at its conclusion. Here, as discussed, our interpretation of the phrase "to the extent that" is likewise consistent with section 2-1205's purpose of reducing the costs of medical malpractice actions by eliminating duplicative recoveries while still preventing a plaintiff from being subjected to an uncompensated loss should an insurer assert its right to recover medical payments.

¶ 118     Accordingly, we conclude that the trial court erred in denying defendants' motion to reduce the judgment under section 2-1205, and we reverse its ruling.

¶ 119                              e. Amount of Reduction

¶ 120     As discussed, section 2-1205 "modifies the collateral source rule and allows the reduction of a medical malpractice judgment by 100% of the medical, hospital, nursing, or caretaking charges associated with the claim." *Bloome*, 279 Ill. App. 3d at 481. Here, the jury awarded $310,000 for the medical charges associated with the claim. *Cf. First Midwest Trust Co. v. Rogers*, 296 Ill. App. 3d 416, 433 (1998), *overruled on other grounds by Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63 (2002) (beginning with entire cost of medical services in computing the possible reduction of judgment under section 2-1205.1 (735 ILCS 5/2-1205.1 (West 1992)), which relates to setoffs in non-medical malpractice cases). However, defendants are not entitled to reduce the judgment by the entire $310,000, as subsection 2-1205(2) prohibits reduction to the extent that there is a right of recoupment. 735 ILCS 5/2-1205 (West 2010). In calculating BCBS's right of recoupment, defendants cite materials "stricken" by the trial court. Therefore, we do not rely on their computation but instead rely on the trial court's finding that BCBS paid $134,933.85[2] for Leanne's medical expenses. Accordingly, this amount may *not* be reduced from the judgment, so the reduction is limited to $175,066.15 (*i.e.*, $310,000-$134,933.85). This total conforms to section 2-1205's requirement that the judgment not be reduced by more than 50% of the total amount (735 ILCS 5/2-1205(3) (West 2010)), with the total amount here being $600,000.

_____

[2]This figure is almost the same as one of defendants' computations of the right of recoupment as $134,976.78.

Accordingly, we remand the cause for the trial court to reduce the judgment by $175,066.15.[3]

¶ 121                          III. CONCLUSION

¶ 122    For the foregoing reasons, we reverse the trial court's denial of defendants' motion to reduce the judgment under section 2-1205, and we remand the cause for the trial court to reduce the medical expenses awarded by $175,066.15. We affirm the judgment of the Lake County circuit court in all other respects.

¶ 123    Affirmed in part and reversed in part; cause remanded.

_____

[3]We note that, while plaintiff argues that any right to recoupment bars reduction, he does not offer any alternative calculations for the amount of reduction.