# Illinois Official Reports

## Appellate Court

*Vanderhoof v. Berk*, 2015 IL App (1st) 132927

| | |
|---|---|
| Appellate Court Caption | CAROL VANDERHOOF, as Special Administrator of the Estate of Paul Vanderhoof, Deceased, Plaintiff-Appellee, v. RICHARD S. BERK, M.D. and NORTHSHORE UNIVERSITY HEALTH-SYSTEM FACULTY PRACTICE ASSOCIATES, Defendants-Appellants (NorthShore University HealthSystem, d/b/a Glenbrook Hospital, Defendant). |
| District & No. | First District, First Division<br>Docket No. 1-13-2927 |
| Filed | December 21, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-14475; the Hon. Daniel J. Lynch, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Cassiday Schade, LLP, of Chicago (Julie A. Teuscher, Sandra G. Iorio, and Jonathan E. Cavins, of counsel), for appellants.<br><br>Lipkin & Higgins, of Chicago (Peter F. Higgins, of counsel), and Law Offices of Lynn D. Dowd, of Naperville (Lynn D. Dowd and Frances Leyhane III, of counsel), for appellee. |

PRESIDING JUSTICE LIU delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        On January 12, 2009, Paul Vanderhoof was admitted to the hospital for the surgical removal of his gallbladder, also known as a cholecystectomy. During the procedure, the surgeon severed the patient's common bile duct in error after he misidentified it as the cystic duct. Another surgeon was subsequently called in to perform emergency reconstructive surgery to repair the severed duct. Vanderhoof remained in the hospital for a week following the surgery, during which time he was treated for an intermittent, controlled bile leak. A day after his discharge from the hospital, he was readmitted with complaints of chest and abdominal pain. For the next two months, Vanderhoof remained an inpatient at two hospitals and a rehabilitation nursing facility. He continued to suffer bile leakage, developed a large liver abscess and pneumonia, and ultimately succumbed to septic shock. He died in the hospital on March 19, 2009.

¶ 2        On December 22, 2010, Vanderhoof's wife, Doris, brought a wrongful death and survival action against the surgeon, Dr. Richard Berk, and NorthShore University HealthSystem, d/b/a Glenbrook Hospital.[1] NorthShore University HealthSystem Faculty Practice Associates (NorthShore) was subsequently added as a defendant. After Doris passed away, her daughter, Carol Vanderhoof, became the special administrator of Vanderhoof's estate. Carol filed an amended complaint, alleging that during her father's cholecystectomy, Dr. Berk "[n]egligently and carelessly surgically transected" the common bile duct, "[f]ailed to perform the necessary precautionary methods to ensure a safe gallbladder removal," and "[f]ailed to call for assistance from a specialist with expertise in biliary surgery" before cutting the common bile duct. Plaintiff further alleged that her father died "[a]s a direct and proximate result of one or more of the foregoing negligent acts and/or omissions."

¶ 3        A six-day jury trial commenced on January 25, 2013, during which the parties presented testimony from their respective fact and expert witnesses. At the close of the evidence, defendants presented a motion for a directed verdict, which the circuit court denied. Following deliberations, on February 1, 2013, the jury returned a verdict in favor of plaintiff and against defendants Berk and NorthShore. The jury awarded damages in the amount of $910,742.79. The circuit court entered judgment on the verdict and award. Defendants filed a posttrial motion for a judgment notwithstanding the verdict (judgment *n.o.v.*), or, alternatively, for a new trial. Defendants asserted they were entitled to a judgment *n.o.v.* on the grounds that the evidence at trial failed to establish that Dr. Berk acted negligently or that any alleged negligence was the proximate cause of Vanderhoof's injuries. The circuit court denied the motion on August 19, 2013, and defendants timely filed their notice of appeal on September 13, 2013.

¶ 4        On appeal, defendants contend that: (1) the circuit court erred in denying their motion for judgment *n.o.v.*; (2) the court abused its discretion in admitting evidence of deviations from the standard of care in the absence of expert testimony and that such deviations proximately

---

[1]Prior to trial, Glenbrook Hospital was dismissed from the lawsuit. It is not a party to this appeal.

caused the decedent's injuries; (3) the court abused its discretion in admitting evidence of medical expenses without a proper foundation; (4) statements made by plaintiff's counsel at trial were prejudicial and denied defendants a fair trial; and (5) the jury's verdict was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 5                              I. BACKGROUND
¶ 6                           A. The Gallbladder Surgery
¶ 7      In 2008, Vanderhoof presented on several occasions to his primary care physician, Dr. David Lerner, complaining of heartburn, stomach pain, back pain, nausea, and diarrhea. Dr. Lerner determined Vanderhoof had symptoms of gallbladder disease and referred him to Dr. Berk for a surgical consultation. Following the consultation, Vanderhoof decided to undergo surgery to remove his gallbladder.

¶ 8      On January 12, 2009, after receiving preoperative clearance from Dr. Lerner, Vanderhoof underwent the cholecystectomy at Glenbrook Hospital. Dr. Berk initially proceeded with a laparoscopic procedure, but soon converted to an open procedure after encountering significant inflammation around the gallbladder. After working to dissect the patient's gallbladder from the surrounding structures, Dr. Berk transected, or cut through, what he thought was the cystic duct; instead, it turned out, the severed structure was the common bile duct. Immediately afterward, Dr. Berk called in his colleague, Dr. Emilio Barrera, who continued with the dissection until he was able to confirm that the common bile duct had been cut. Dr. Barrera then called Dr. Marshall Baker, a hepatobiliary specialist, to repair the severed duct. Dr. Baker completed the gallbladder dissection, and then performed a Roux-en-Y reconstruction, a procedure by which the flow of bile is rerouted through a loop of intestine. The entire surgery, including the reconstruction, lasted approximately eight hours.

¶ 9      Following his surgery, Vanderhoof suffered from an intermittent bile leak, which required the insertion of two drains. He was initially discharged a week after the surgery, on January 19, but was readmitted the next day. Vanderhoof spent another month in the hospital before he was briefly admitted to a nursing and rehabilitation facility on February 20. Four days later, he had to be admitted to Evanston Hospital. Toward the end of this hospitalization, he became severely septic, and passed away on March 19. Dr. Baker completed and signed the death certificate a day or two thereafter, and listed "bile duct injury" as "the underlying cause, disease or injury that initiated the events resulting in death last."

¶ 10                            B. Evidence at Trial
¶ 11     At trial, the jury heard testimony from Dr. Berk, as well as the two other surgeons and a physician's assistant who attended to Vanderhoof during the surgery. Both sides also presented their respective experts. The following evidence, as pertinent to this appeal, was elicited at trial.[2]

---

[2]The jury heard from other witnesses, including other treating physicians. We find, however, that the testimony of these individuals does not bear directly on our analysis.

¶ 12                          1. *Dr. Jonathan Finks*

¶ 13    Plaintiff's expert, Dr. Jonathan Finks, is a board-certified general surgeon who has performed 4 to 6 laparoscopic cholecystectomies per month since 2005, of which 12 have been open procedures. He explained that during a gallbladder removal procedure, whether laparoscopic or open, the surgeon must first identify the cystic duct and the cystic artery that attach to the gallbladder. Once he has identified these structures, the surgeon then places metal clips on each of them and cuts between the clips. Dr. Finks also explained that the common bile duct, which delivers bile to the small intestine for fat digestion, is not directly connected to the gallbladder but is formed where the cystic duct joins the common hepatic duct.

¶ 14    Dr. Finks testified that the top priority in performing a gallbladder dissection is to make sure the common bile duct is not cut. When this occurs, it is a "devastating injury." For this reason, he explained, it is important for a surgeon to conclusively identify a structure before cutting it. According to Dr. Finks, there are four precautionary steps that a reasonably careful surgeon performing a cholecystectomy should employ to minimize the chance of misidentifying and cutting the common bile duct. The first step is to utilize a technique called the critical view of safety, or CVOS, which involves a three-part process: (1) dissection of an area called the Triangle of Calot; (2) removal of the infundibulum, *i.e.*, the bottom part of the gallbladder, from the liver; and (3) confirmation that the two structures going into the gallbladder are not heading back to the liver. Dr. Finks testified that achieving the CVOS results in a clear view of the patient's anatomy and helps to ensure the common bile duct will not be severed inadvertently. In his opinion, the CVOS is the safest approach for performing both laparoscopic and open procedures, and the standard of care requires a reasonably careful surgeon to try to achieve the CVOS before cutting a structure.

¶ 15    Second, Dr. Finks stated, if the CVOS cannot be achieved, the surgeon should take alternative steps to correctly identify the common bile duct so as to avoid injuring it. One option is to perform an intraoperative cholangiogram, or IOC, a procedure in which a small hole is made in the duct and a dye agent is injected through a catheter. The surgeon then uses an X-ray machine to assess and identify the relevant structures through real-time images. Dr. Finks acknowledged that an IOC is not a risk-free procedure, but confirmed that studies show the procedure is generally safe and reliable.

¶ 16    Third, if the surgeon is unable to identify the various ductile structures through the CVOS technique or an IOC, the next precautionary step he should take is to consult with another surgeon–ideally a hepatobiliary surgeon–for a second opinion before cutting the suspect structure.

¶ 17    Fourth, Dr. Finks stated, if the surgeon still is unable to clearly identify the anatomical structures after utilizing the foregoing three steps, then he should perform only a partial removal of the gallbladder instead of a complete removal. Dr. Finks testified that the surgeon should get as much of the gallbladder off the liver as possible, divide it there, leave a drain, and "call it good." Dr. Finks acknowledged that a partial removal is not ideal because a portion of the diseased gallbladder would be left behind and there would be a risk of a bile leak. However, he explained, a procedure called an endoscopic retrograde cholangiopancreatography (ERCP) could be performed later to resolve the possible bile leak. According to Dr. Finks, "everything is better than cutting the common bile duct."

¶ 18    Dr. Finks noted that, according to the January 12, 2009 surgical report, Vanderhoof had "a lot of inflammation" around his gallbladder, causing it to adhere to the surrounding structures.

Under these circumstances, Dr. Finks agreed that it was reasonable for Dr. Berk to convert from a laparoscopic procedure to an open procedure. Dr. Finks opined to a reasonable degree of medical certainty, however, that Dr. Berk violated the standard of care by transecting the duct without first taking any of these four precautionary steps (*i.e.*, CVOS, IOC, consult, or partial removal) to avoid injury to the common bile duct. Dr. Finks believed that, had Dr. Berk taken "any of these steps," he would have "substantially reduced the risk of injury to Mr. Vanderhoof's common bile duct." He further testified that Dr. Berk's transection of the common bile duct and the reconstruction surgery that it necessitated made Vanderhoof's postsurgery complications, including the infection that ultimately caused his death, more likely to occur.

¶ 19 Based on his review of the medical records, Dr. Finks did not believe that Dr. Berk even attempted to achieve the CVOS before he cut the common bile duct. Instead, it appeared that Dr. Berk simply "saw one structure enter the gallbladder, assumed it was the cystic duct, and he clipped it and cut it." Dr. Finks acknowledged that, due to inflammation, there are times that a surgeon cannot achieve the CVOS without causing injury, and said it "[s]ound[ed] like this was one of those cases." He pointed out, however, that Dr. Barrera and Dr. Baker were later able to achieve the CVOS during the same surgery, after the common bile duct had been cut. While this did not definitively prove that Dr. Berk could have achieved the CVOS earlier in the operation, Dr. Finks believed it was "reasonable proof" that he could have and that failure to attempt the technique before cutting was a deviation from the standard of care.

¶ 20 Dr. Finks further testified that Dr. Berk's failure to use an IOC constituted a deviation from the standard of care because there was evidence of significant inflammation surrounding the gallbladder which rendered it difficult to identify the anatomy during the procedure. On cross-examination, Dr. Finks conceded that he would be speculating to say that Dr. Berk would have successfully identified the common bile duct with an IOC, but pointed out that Dr. Baker performed an IOC without complication during the Roux-en-Y repair surgery.

¶ 21 Dr. Finks also testified that Dr. Berk deviated from the standard of care during Vanderhoof's surgery because he failed to consult with another surgeon for a second opinion when he was unable to conclusively identify the anatomy. Finally, Dr. Finks noted, when Dr. Berk encountered difficulty identifying the structures because of the inflammation, he should have opted to limit the procedure to a partial gallbladder removal to avoid injuring the common bile duct. Proceeding with a full gallbladder removal when he was unable to conclusively identify the relevant anatomy was also a violation of the standard of care.

¶ 22 Dr. Finks concluded, to a reasonable degree of medical certainty, that Dr. Berk's transection of Vanderhoof's common bile duct, and nothing else, caused the bile leak and sepsis that eventually led to his death. It was Dr. Finks' overall opinion that Dr. Berk's "failure to use all the tools available to him led to his transecting the common bile duct," and had Dr. Berk used any one of them, the risk of injury to Vanderhoof's common bile duct would have been "greatly diminished." Dr. Finks testified that the severed bile duct necessitated the Roux-en-Y procedure, after which the duct likely "scarred down" such that a bile leak resulted. This bile leakage, Dr. Finks explained, can cause fever, pain, nausea, vomiting, and infection, all of which eventually occurred in this case. In Dr. Finks' opinion, "the bile duct injury essentially led to a domino effect of problems that led to [Vanderhoof's] death."

¶ 23 During cross-examination, Dr. Finks acknowledged that because of his advanced age (80 years) and existing medical issues, Vanderhoof was at significant risk for postsurgical

complications. Dr. Finks conceded the possibility that Vanderhoof might have died following surgery even absent a bile duct injury, but stated that this outcome was "not very likely." Dr. Finks noted that the medical record indicated that, prior to surgery and despite his advanced age, Vanderhoof had been capable of handling the daily activities of independent living and even held a part-time job. When asked whether it was more probable than not that Vanderhoof could have become septic absent the injury to his common bile duct, Dr. Finks responded:

> "He could have gotten a wound infection, could have gotten pneumonia. It's hard to predict. But I don't think it would have been as likely as it was having had his common bile duct transected and having a bile leak and all the other things that happened."

¶ 24    Dr. Finks conceded that "this was a difficult case" with "a lot of inflammation" and a "high risk of making some sort of injury to the bile duct." He nonetheless disagreed with Dr. Baker's contention that it was "impossible" to remove the patient's gallbladder without injuring the common bile duct. While Dr. Finks could not conclusively say that the bile duct injury sustained by Vanderhoof would never have occurred absent a negligent act, he reiterated that, had Dr. Berk taken any of the four precautionary steps to avoid misidentification of the common bile duct, but still accidentally ripped or nicked it, that injury would still have been less severe than a completely transected bile duct. According to Dr. Finks, the former could be repaired with a couple of stitches, while the latter would require drains and extensive reconstructive surgery.

### 2. *Jennifer Foster*

¶ 26    Jennifer Foster was Dr. Berk's physician's assistant during Vanderhoof's surgery. She testified that it was "incredibly difficult" to see the anatomy from the beginning of the surgery. The gallbladder was "matted down" and covered with adhesions and inflammatory tissue. Even after Dr. Berk converted to an open procedure, it was still difficult to delineate the anatomy. Foster recalled that after Dr. Berk cut what he thought was the cystic duct, "[w]ithin a few minutes *** [she] could tell he was concerned about it and realized something was amiss. And that's when [they] called Dr. Barrera." Foster testified that when she saw Vanderhoof on the day of his discharge from the hospital, a week after the surgery, he was eating "okay," his bowel function had returned, and he was on oral pain medication. The next day, January 20, he was readmitted to the hospital after he presented with abdominal and chest pain. A CT scan revealed that he likely had pneumonia, and he was placed on antibiotics.

### 3. *Dr. Richard Berk*

¶ 28    Dr. Berk testified that Vanderhoof's cholecystectomy was "[p]robably" one of the more difficult he had ever performed on a patient. At the time of surgery, he, Dr. Baker, and Dr. Barrera were all employed by the same medical practice, NorthShore. Dr. Berk noted that Vanderhoof's gallbladder was embedded onto his liver due to inflammation, which prompted him to convert from a laparoscopic procedure to an open procedure very quickly. Characterizing the procedure as "[t]edious, but not difficult," Dr. Berk testified that he did not have any trouble delineating the anatomy prior to cutting the common bile duct.

¶ 29    Dr. Berk proceeded to dissect the tissue surrounding the gallbladder until he saw a structure that he was certain was the cystic duct; it was the same size and shape as the cystic duct and going in the right direction. He placed clips on it and cut it with surgical scissors. It was immediately evident, however, that he had possibly cut the common bile duct, and he

acknowledged that this was an error. At this point he called in Dr. Barrera "to take a look and to see what's going on." Dr. Barrera continued the dissection and, after about 30 to 40 minutes, confirmed that the common bile duct had in fact been cut.

¶ 30     Dr. Berk testified that a common bile duct injury due to misidentification is a known risk of gallbladder surgery. He agreed that attempting to attain the CVOS is a reasonable precaution to take in order to identify anatomical structures, but only during a laparoscopic surgery. He acknowledged that when the CVOS is actually achieved, it substantially reduces the risk of cutting the common bile duct. At his deposition, Dr. Berk had testified that he had used the anatomic landmark technique to dissect the tissue surrounding Vanderhoof's gallbladder; at trial however, he testified that he tried to use the CVOS dissection technique and thought he had achieved it. He explained that he considers the techniques to be analogous to each other. When pressed, however, he admitted that the anatomic landmark technique does not include the same three-step process required to achieve the CVOS. He then testified that he could not have achieved the CVOS in this case because he could not lift Vanderhoof's gallbladder off from the liver; had he tried to do so, he would have ripped the common bile duct. He noted that Dr. Baker was later able to achieve the three requirements of the CVOS only because the situation was different: the common bile duct had already been cut and, as a result, the structures could be lifted up.

¶ 31     Dr. Berk also agreed that performing an IOC is another reasonable precaution a surgeon can take to conclusively identify ductile anatomy; however, he did not believe that an IOC would have helped him in this case. He acknowledged that Dr. Baker used an IOC later in the surgery without complication, but explained that this was a different procedure involving a catheter placed in the cystic duct, not the common bile duct. According to Dr. Berk, it would have been "absolutely impossible" to perform an IOC procedure on the cystic duct during the initial surgery because it was tucked under the gallbladder, and if he had performed an IOC on what turned out to be the common bile duct, he would have destroyed the tissue of the duct by clipping it and also would have punctured the duct. Dr. Berk nonetheless conceded that there is a "big difference" between an injury to the common bile duct from an IOC and a complete transection of the duct.

¶ 32     Next, Dr. Berk testified that he did not call Dr. Barrera or another surgeon for a second opinion before cutting the common bile duct. After the transection, however, he recognized there was a problem and called Dr. Barrera immediately. Dr. Barrera arrived five minutes later. Dr. Berk admitted that he has called Dr. Barrera for assistance during previous procedures when he experienced difficulty delineating the anatomy.

¶ 33     Finally, Dr. Berk testified that he was familiar with the technique of partially removing a gallbladder and had used it before. In Vanderhoof's situation, though, he did not believe that a partial removal would have been appropriate because the affected gallbladder would have been left in the patient's abdomen and there would have been bile leakage into that area. Dr. Berk noted that Vanderhoof had multiple comorbidities that "contributed *** a great deal" to his postsurgery complications. Ultimately, however, because he had no contact with Vanderhoof after January 2009, Dr. Berk admitted that he "really d[id]n't know" what role, if any, the bile duct injury played in Vanderhoof's inability to recover from the surgery.

¶ 34                                    4. *Dr. Emilio Barrera*

¶ 35        At trial, defendants presented Dr. Barrera's testimony from his evidence deposition. According to Dr. Barrera, who at the time was the head surgeon at Glenbrook Hospital, the medical records show that he received a call from Dr. Berk, who reported a problem after he had identified "what he thought was a cystic duct and divided it." After Dr. Barrera arrived at the operating room and assessed the situation, he concluded that the common bile duct had been injured. He then asked a nurse to contact Dr. Baker, a specialist in hepatobiliary injuries and reconstruction.

¶ 36        Dr. Barrera disagreed with Dr. Finks' opinions regarding the standard of care. Dr. Barrera testified that the standard of care did not require a surgeon to "develop" the CVOS, use an IOC, or consult with a colleague, before cutting any structures. He further stated that the CVOS, IOC, and consultation steps can only minimize the risk of a common bile duct injury, not eliminate it. In Dr. Barrera's opinion, an experienced surgeon may misidentify and injure the common bile duct while still complying with the standard of care because it is sometimes impossible to conclusively identify the relevant structures. Dr. Barrera did not believe that Dr. Berk deviated from the standard of care in this case.

¶ 37                                    5. *Dr. Marshall Baker*

¶ 38        Dr. Baker is a hepatobiliary specialist and was formerly Dr. Berk's partner and a NorthShore employee. Dr. Baker testified that after he was called to Vanderhoof's surgery, he dissected the cystic duct out. He recalled that the area was very scarred and inflamed; the bile duct was "incredibly friable" and fused to the back of the gallbladder. Dr. Baker testified that it was impossible to remove the gallbladder without injuring the common bile duct and necessitating a reconstruction surgery. Dr. Baker stated that if he had been called in before the injury, he would have had to cut out part of the common bile duct in order to remove the gallbladder. In his opinion, common bile duct injuries by misidentification or ripping are a known risk of gallbladder surgery–even for reasonably careful surgeons. He thought Dr. Berk was "incredibly careful" during this surgery.

¶ 39        Dr. Baker further testified that the CVOS is not always attainable but is instead "really a theoretical goal," particularly where the gallbladder and bile duct cannot be separated because of inflammation. Additionally, he did not believe that an IOC would have helped to avoid an injury in this case because the structures were "stuck together so densely, you c[ouldn]'t take one out without the other." Prior to trial, Dr. Baker had testified that the standard of care requires a surgeon to "call for help" when encountering a difficult gallbladder; at trial, however, he disagreed that Dr. Berk's failure to call another surgeon for a consultation before cutting the duct was a violation of the standard of care.

¶ 40        Dr. Baker treated Vanderhoof and monitored his postoperative condition for the two months following his surgery. Vanderhoof had a controlled bile leak, a known complication of gallbladder surgery which Dr. Baker testified may occur even in the absence of a common bile duct injury. Dr. Baker did not believe Vanderhoof's bile duct injury and the Roux-en-Y reconstruction caused his death. Instead, the patient's advanced age and preexisting medical conditions "contributed to poor healing" and "resulted in a very slow recovery that just set him up for additional complications." Dr. Baker testified that Vanderhoof would have likely sustained the same complications following surgery even if his common bile duct had not been cut.

¶ 41    Regarding his written notation on Vanderhoof's death certificate, Dr. Baker admitted that he had listed "bile duct injury" as the precipitating event leading to the decedent's liver abscess, sepsis, and ultimately, death, but stated that, in retrospect, he did not think this was right and it was "[his] mistake." Dr. Baker believed that Vanderhoof's prolonged hospitalization resulted not from the bile leak, but from the overall surgery combined with his comorbid conditions and failure to heal. He noted that Vanderhoof "was a frail older person with severe heart disease and severe peripheral vascular disease and renal insufficiency, and kidney failure" prior to the surgery, conditions that were the "more immediate causes of death." When asked if "the common bile duct injury contribute[d] at all to [Vanderhoof's] death," Dr. Baker said, "[i]t's tough to say."

¶ 42                                   6. *Dr. Steven Bines*

¶ 43    Dr. Steven Bines, a general surgeon and surgical oncologist, testified as the defense's retained expert. He has performed approximately 1,000 open cholecystectomies and 1,000 laparoscopic ones. In his opinion, Dr. Berk did not deviate from the standard of care but instead, "demonstrated a high level of surgical care in a difficult case" and "used the appropriate interventions at the appropriate time[s]." Dr. Bines did not believe Vanderhoof's death could be attributed to his bile duct injury with a reasonable degree of certainty.

¶ 44    Dr. Bines testified that he found no fault with Dr. Berk's performance on the day of the surgery. He noted that Dr. Berk performed "a careful dissection under very adverse conditions," "used the appropriate visualization of the anatomy based on his techniques," and came to the "reasonable conclusion that he saw the appropriate structures entering the gallbladder." Dr. Bines explained that "[a] misidentification injury can under certain circumstances occur without any negligence and despite the best efforts of a qualified surgeon conducting the operation appropriately" because it is impossible for a surgeon to determine what structure he is looking at with absolute certainty.

¶ 45    According to Dr. Bines, the standard of care requires a methodical dissection and the identification of the insertion of ducts on the gallbladder. It does not specifically require that the CVOS technique be employed. In Dr. Bines' view, the CVOS does not prevent misidentification injuries and the dissection it requires can itself cause injury to the common bile duct. Dr. Bines noted that when Dr. Barrera later achieved the CVOS, the common bile duct was already cut, making it "a completely different animal" involving different risks and techniques.

¶ 46    Dr. Bines also disagreed that the standard of care required Dr. Berk to perform an IOC here. In Dr. Bines' opinion, the catheter used for an IOC could have caused problems and the procedure is not always reliable in showing anatomy. He pointed out that many good, qualified surgeons do not routinely use IOCs, although he admitted that he does selectively use them to help identify anatomy. Dr. Bines further noted that injury to a duct from an IOC may not be limited to a small hole, but can include complete transection, making it impossible to say with certainty that an IOC would have resulted in a smaller injury.

¶ 47    In addition, Dr. Bines testified, the standard of care also did not require Dr. Berk to call a colleague for a second opinion before cutting. Dr. Bines believed that Dr. Berk reasonably concluded that "what he saw was compatible with proceeding with the next step in the operation." Dr. Bines agreed with Dr. Baker that the cystic duct in Vanderhoof's case could never have been identified unless the common bile duct was first transected and brought out of

the way. Therefore, it was impossible to remove the gallbladder without cutting the common bile duct.

¶ 48    Finally, Dr. Bines testified that the standard of care did not require Dr. Berk to do a partial removal. With tissue-thin structures, instead of healthy, healing tissue, and a patient with Vanderhoof's underlying diseased state, Dr. Bines believed the outcome would likely have been the same had Dr. Berk proceeded with only a partial gallbladder removal.

¶ 49    Ultimately, Dr. Bines did not believe that the risk of injury would have been minimized if Dr. Berk had achieved the CVOS, performed an IOC, or consulted with another surgeon. In his view, it was impossible to remove Vanderhoof's gallbladder without cutting the common bile duct. Dr. Bines opined that it was more likely than not that the bile duct injury did not cause pneumonia or the patient's death. Rather, he believed it was the length of the operation and the conversion to an open procedure that led to the pneumonia that caused Vanderhoof's death. Dr. Bines noted that the surgery disrupted Vanderhoof's breathing, leading to fluid build-up and collapse of the lungs, which resulted in the bacterial infection. He also pointed out that Vanderhoof's liver abscess contained types of bacteria that could originate in the lung. Dr. Bines concluded, in the end, that the complications and outcome in this case were consistent with an 80-year-old who has multiple comorbidities recovering from a cholecystectomy.

¶ 50                              7. *Dr. David Lerner*

¶ 51    Dr. Lerner was Vanderhoof's primary care physician for at least 10 years prior to the gallbladder surgery. Dr. Lerner testified that Vanderhoof was afflicted with conditions such as asthma, congestive heart failure, hypertension, coronary artery disease, and chronic kidney disease; however, most of these were controlled by a medication regimen prior to the surgery. Dr. Lerner expressed no opinion regarding whether these preexisting conditions caused or contributed to his former patient's death.

¶ 52    Dr. Lerner testified that on the day of Vanderhoof's initial discharge from Glenbrook Hospital, his white blood cell count was normal, indicating the absence of a bacterial infection. Dr. Lerner saw the patient again two days later, at which time he had no complaints. A CT scan was ordered to rule out pneumonia and pulmonary embolism. The results indicated there was no infection inside the abdomen. Finally, Dr. Lerner saw Vanderhoof on February 2, when he was transferred from the hospital to a rehabilitation facility. He had a normal white blood cell count but had been placed on a broad-spectrum antibiotic to prevent infections from developing.

¶ 53                              C. Pretrial Motions

¶ 54    Prior to trial, defendants filed a motion *in limine* seeking to bar plaintiff from presenting evidence of alleged deviations from the standard of care where they argued that plaintiff had established no evidence, prior to trial, to show that Vanderhoof's common bile duct injury would have been prevented had Dr. Berk: (1) utilized the CVOS technique; (2) performed an IOC; and/or (3) consulted with another surgeon before cutting what he thought was the cystic duct. Plaintiff, in turn, sought to bar evidence that Dr. Baker would have intentionally transected the common bile duct in order to access the gallbladder. The court barred evidence that the standard of care required Dr. Berk to "actually achieve" the CVOS, but otherwise denied both parties' motions, noting that these were matters for the jury to consider.

ANALYSIS

¶ 56    Defendants raise several issues on appeal, specifically, whether: (1) the circuit court erred in denying their motion for judgment *n.o.v.*; (2) the court abused its discretion in admitting evidence of deviations from the standard of care in the absence of expert testimony that such deviations proximately caused the decedent's injuries; (3) the court abused its discretion in admitting evidence of medical expenses without a proper foundation; (4) statements made by plaintiff's counsel at trial were prejudicial and denied defendants a fair trial; and (5) the jury's verdict was against the manifest weight of the evidence. We address these arguments *seriatim*.

¶ 57                    A. Denial of Motion for Judgment *N.O.V.*

¶ 58    Defendants contend that they are entitled to a judgment *n.o.v.* because plaintiff failed to present any expert evidence to establish that Dr. Berk's alleged deviations from the standard of care proximately caused Vanderhoof's injuries or his death. Specifically, they argue there was no testimony indicating that Dr. Berk would have avoided injuring the common bile duct during the surgery had he followed any part of the four-step protocol outlined in Dr. Finks' testimony.[3]

¶ 59    A motion for judgment *n.o.v.*, which asks the court to set aside the jury's verdict and enter judgment in favor of the movant, may be granted only when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Id.* Moreover, the motion should not be granted "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* at 454. Because defendants' challenge to the denial of their motion presents a question of law as to whether there is "a total failure or lack of evidence to prove any necessary element" of plaintiff's case (internal quotation marks omitted) (*York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006)), our review is *de novo* (*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999)).

¶ 60    To establish a claim of medical malpractice against a health care provider, a plaintiff must prove: (1) the applicable standard of care; (2) a provider's negligent failure to comply with the applicable standard of care; and (3) a resulting injury proximately caused by the alleged

_____

[3]In their reply brief, defendants contend that plaintiff failed to specifically address their arguments that judgment *n.o.v.* was proper and that the jury's verdict was against the manifest weight of the evidence, such that forfeiture is appropriate under Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013). Indeed, plaintiff chose to respond to these arguments–as to defendants' argument regarding the admission of medical bills discussed below–by identifying certain items not contained in the record on appeal and asserting that the issues cannot be decided on an incomplete record. Defendants subsequently supplemented the record. We note that forfeiture is a limitation on the parties, not on the court. *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967). Plaintiff's assertion that causation was sufficiently established at trial is evident from the substance of her brief, which points to specific expert testimony establishing a causal link between the alleged negligence and Vanderhoof's injuries and death.

negligence. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). "A plaintiff must present at least *some* evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law." (Emphasis added.) *Id.* at 123. Generally, "[i]ssues involving proximate cause are fact specific and therefore uniquely for the jury's determination." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997). To establish proximate cause, a plaintiff must show that "defendant's negligence 'more probably than not' caused plaintiff's injury." *Id.* Such proof "must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." (Internal quotation marks omitted.) *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 843 (2010).

¶ 61 Under the lost chance doctrine, a plaintiff may establish proximate cause by proving that the alleged negligence resulted in an injury in which the patient was deprived "of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holton*, 176 Ill. 2d at 111. Causation evidence may be presented through the plaintiff's expert's opinion, to a reasonable degree of medical certainty, that the defendant's alleged negligence "proximately caused the increased risk of harm or lost chance of recovery." *Id.* at 119. To show proximate cause, the plaintiff is not required to show that "a better result would have been achieved" or that the patient would have had a greater than 50% chance of survival or recovery, absent the alleged malpractice. (Internal quotation marks omitted.) *Id.* at 106, 119.

¶ 62 In order to find that the circuit court erred in denying defendants' motion for a judgment *n.o.v.* in this case, we must conclude that there was "a total failure or lack of evidence" at trial to support the jury's finding that Dr. Berk deviated from the applicable standard of care and that his negligence was a proximate cause of Vanderhoof's injuries. (Internal quotation marks omitted.) *York*, 222 Ill. 2d at 178. If there was *some* evidence to support the jury's verdict, then defendants are not entitled to judgment *n.o.v.* See *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, ¶ 63. Here, the circuit court found there was sufficient evidence to submit the case to the jury. Specifically, the court determined that plaintiff presented the jury with expert evidence, through Dr. Finks' testimony, of "Vanderhoof's lost chance, his lessened effective surgical treatment, his increased risk of a cut common bile duct as opposed to just the continuing ongoing risk of an avulsed one which would have been less injured and required more minor repair and therefore [would have entailed an] increase[d] chance of recovery." While acknowledging the contrary evidence established through Dr. Baker's testimony–that it was impossible to remove the gallbladder without injuring the common bile duct–the circuit court noted the "substantial impeachment" of Dr. Baker regarding his report of the cause of death in the death certificate, and suggested the jury either "didn't believe [ ]his testimony or didn't find it reliable." In the end, the court determined that it could not find that the verdict reflected "an unreasonable conclusion *** in light of the evidence before the jury. They're the triers of fact *** that ha[ve] to determine the reliability and the credibility of witnesses on these subjects and they evidently have."

¶ 63 We must determine whether plaintiff established *some* expert evidence to show that Dr. Berk's alleged deviation from the standard of care, *i.e.*, his failure to follow the four-step

protocol, proximately caused an injury to Vanderhoof. *Id.*[4] In other words, we must decide if all of the trial evidence, taken in the light most favorable to plaintiff, so overwhelmingly favors defendants that no contrary verdict based on this evidence could ever stand. Following our review of the record, we agree with the circuit court.

¶ 64 Dr. Finks testified that the applicable standard of care required Dr. Berk to take certain precautionary measures to avoid cutting the common bile duct in this case (*i.e.*, attempt to achieve the CVOS, perform an IOC, obtain a second opinion, and perform only a partial gallbladder removal) and that, had Dr. Berk done so, the chance of Vanderhoof's common bile duct being severed "would have been greatly diminished." Dr. Finks concluded that, absent Dr. Berk's deviation from the standard of care, Vanderhoof would not have suffered the resulting injuries, reconstructive repair surgery, and the bile leakage, infection, and sepsis that resulted in his death. Dr. Bines completely disagreed with Dr. Finks' opinion, and stated that none of the four steps would have prevented injury to the common bile duct requiring reconstructive surgery. Faced with conflicting expert opinions on proximate cause, the jury had to decide which expert it found more credible. It was the jury's role to make such a determination. It is not our task, in reviewing the circuit court's denial of judgment *n.o.v.*, to "usurp the function of the jury and substitute [our] judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple*, 151 Ill. 2d at 452-53.

¶ 65 Moreover, although the four steps were explained in serial order during Dr. Finks' trial testimony, we believe it is not necessary to determine whether there is sufficient evidence that any single departure from these steps by Dr. Berk, in isolation, was a proximate cause of Vanderhoof's injuries. As the circuit court aptly noted, the protocol described by Dr. Finks "is a four-step process and to–to break it down and, in essence uncouple these four steps, is not to give the *** standard of care protocol its fair assessment." Built into the protocol is the possibility that any given step may be unsuccessful and another alternative may be necessary. Therefore, we view the causation evidence presented by plaintiff by considering Dr. Berk's failure to attempt the four steps of the protocol, collectively, *as a whole*.

¶ 66 Evidence presented at trial established that Dr. Berk did not utilize the four-step protocol that Dr. Finks said was required under the applicable standard of care. Indeed, with the exception of the CVOS, which he at first claimed to have attempted, but later admitted was a technique involving different requirements than the anatomical landmark technique that he actually used, Dr. Berk conceded at trial that he did not attempt to take any of the four steps prior to cutting the common bile duct inadvertently.

¶ 67 We agree with plaintiff's assertion that she did not have to show that Dr. Berk's failure to take any of the four precautionary steps actually deprived the decedent of a better outcome or a completely successful recovery. Furthermore, plaintiff was not required to prove that Vanderhoof "would have enjoyed a greater than 50% chance of survival or recovery absent the

---

[4]Defendants complain that plaintiff "over-simplifies" her theory of negligence in her response on appeal. We find no relevant difference, however, between plaintiff's argument at trial that Dr. Berk deviated from the standard of care by not following the precautionary measures to identify the common bile duct before cutting it and the statement in her response brief that "[i]t was a deviation from the standard of care for Dr. Berk to cut [decedent's] common bile duct without first conclusively identifying it."

- 13 -

alleged malpractice." *Holton*, 176 Ill. 2d at 119. Our sister courts have also acknowledged this delineation in proof. See *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 23 (rejecting the argument, in reversing a directed verdict in favor of defendants, that plaintiff failed to show adequate causation evidence because his expert " 'was unable to opine that the outcome in [the decedent's] specific case would have been different with earlier treatment' "); *Perkey*, 2013 IL App (2d) 120470, ¶ 63 (judgment as a matter of law was not appropriate where a plaintiff presented "some evidence" that the alleged negligence proximately caused an increased risk of harm or lost chance of recovery, even where, absent the alleged negligence, the decedent would have had a less than 50% chance of survival).

¶ 68        Plaintiff presented expert evidence, to a degree of medical certainty, that Dr. Berk's failure to attempt any of the "four steps," more probably than not, resulted in an increased risk of infection for Vanderhoof, lessened the effectiveness of his treatment, or diminished his chance for a successful recovery. She established that her father's subsequent postoperative bile duct scarring, bile leakage, liver abscess, infection, and sepsis, more likely than not, resulted from the severed common bile duct injury and the Roux-en-Y procedure required to repair it. Under *Holton*, she satisfied her burden of proof. 176 Ill. 2d at 119. Accordingly, we find that plaintiff presented sufficient evidence of proximate cause to overcome defendants' motion for judgment *n.o.v.*

¶ 69        Defendants argue that plaintiff's evidence regarding proximate causation was "conclusory" because Dr. Finks could not rule out the possibility that certain steps could not have been achieved or, if achieved, might not have prevented some injury to the common bile duct. Contrary to defendants' assertion, we find that plaintiff was not required to prove that " 'a better result would have been achieved [for Vanderhoof] absent the alleged negligence of [Dr. Berk].' " *Id.* at 106 (quoting *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424 (1975)). *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470 is instructive on this point. In *Perkey*, the decedent complained to the defendant physician of back pain and a number of tests were ordered, including a CT scan to rule out kidney stones. The scan showed abnormal dilation of the pancreatic duct and prompted the radiologist's recommendation to " 'assess for either stricture or tumor causing this finding.' " *Id.* ¶ 5. The defendant failed to disclose the radiologist's recommendation to the decedent and, instead, suggested a " 'wait and see' " approach before conducting further testing. *Id.* ¶¶ 7, 37. Subsequently, the decedent was diagnosed with pancreatic cancer, which, despite surgical treatment, later metastasized to her lung and caused her death. *Id.* ¶¶ 10-12. At trial, the plaintiff's expert testified that the doctor's delay in detecting the cancer caused the decedent to lose a chance at a cure and was a cause of her death. *Id.* ¶ 19. The jury returned a verdict in the plaintiff's favor and judgment was entered against the defendants. The defendants' motion for judgment *n.o.v.* was denied by the circuit court. The appellate court affirmed this ruling, finding that the plaintiff's expert's testimony regarding the standard of care "as what 80% of physicians would do was, at most, conflicting evidence that could have borne on her credibility," and, "[a]s such, these statements alone could not serve as the basis for a directed verdict or judgment *n.o.v.*" *Id.* ¶ 55.

¶ 70        The defendants in *Perkey*, like defendants in this case, argued that the plaintiff's expert's lack of "certainty" broke the causal connection between the defendants' alleged negligence and the plaintiff's lost chance of recovery. *Id.* ¶ 62. The expert could not state with certainty how far the patient's cancer had advanced at the time the CT scan was performed and conceded that it might have already advanced to Stage IIB, the same stage it was when the tumor was

eventually detected and removed. *Id.* ¶¶ 62, 64. The appellate court concluded that this discrepancy amounted to an issue of the expert's credibility, such that "[t]he jury was faced with a classic battle of the experts, and the battle was for the jury, as the trier of fact, to resolve." *Id.* ¶ 66. Where the plaintiff presented at least "some evidence" that the alleged negligence decreased the decedent's chances of recovery, the jury's verdict would not be disturbed. *Id.* ¶ 63.

¶ 71 In their reply brief, defendants attempt to distinguish *Perkey* by arguing that the expert there provided percentages to quantify how much the alleged negligence reduced the plaintiff's chances of recovery. They cite no authority, however, standing for the proposition that such quantification is required for an expert opinion to be rendered with a reasonable degree of medical certainty. The court in *Perkey* merely held that "some evidence" supporting causation was required to support the expert's opinion for denial of judgment *n.o.v.* to be proper. Indeed, the use of percentages to quantify the relative risk to a plaintiff with or without the defendant's negligence seems most in keeping with the "separate injury" approach to the lost chance doctrine (in which a plaintiff is permitted to recover damages proportionate to the degree of lost chance), a view not adopted by our supreme court in *Holton*. See 176 Ill. 2d at 112 & n.1 (discussing the "relaxed causation" and "separate injury" approaches).

¶ 72 Defendants discuss at length how they believe the circuit court ignored the uncertainties in Dr. Finks' testimony and, in doing so, "eliminated proximate cause as a necessary element of plaintiff's case." The record does not support this characterization. We believe the circuit court correctly viewed defendants' efforts to hold Dr. Finks to a standard of absolute certainty as being akin to requiring plaintiff to prove that, but for the claimed negligence, a better result would have been obtained. This is contrary to established precedent. See *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 424 (1975) (holding that "[i]t is not necessary to become involved in all of the collateral ramifications that the 'better result' test could inject into a case"); *Holton*, 176 Ill. 2d at 107 (holding that "[t]he 'better result test' is not a part of plaintiff's burden of proof"). As the circuit court correctly noted, "[e]xpert testimony can be expressed in terms of probabilities [as opposed to certainties] as long as it is within a reasonable degree of medical certainty."

¶ 73 Defendants further argue that Dr. Finks' testimony leaves a "fatal gap" between the alleged deviations and Vanderhoof's injury. Their reliance on *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997) for this proposition is misplaced. In *Aguilera*, the plaintiff in a medical malpractice suit presented testimony from two expert witnesses that an earlier CT scan of the decedent would have allowed surgical intervention that may have saved his life. *Id.* at 969-70. Both of the experts admitted, however, that the decision to operate would not have been made without input from a neurosurgeon. Two neurosurgeons testified during the trial that "even with an earlier CT scan, surgery would not have been appropriate." *Id.* at 975. The jury found in favor of the plaintiff and the defendant moved for judgment *n.o.v.* After determining that the plaintiff had presented no evidence to show that the decedent's treatment would have been any different had the omitted steps been taken, the circuit court entered judgment *n.o.v.* On review, the appellate court affirmed, finding that "[t]he absence of expert testimony that *** an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery create[d] a gap in the evidence of proximate cause fatal to plaintiff's case." *Id.*

¶ 74    The case before us is not analogous to *Aguilera.* Here, Dr. Finks testified that Dr. Berk failed to follow a four-step protocol required by the applicable standard of care that, if followed, would have "greatly diminished" the risk of injury to the common bile duct; and that this failure caused or contributed to the misidentification and complete transection of the common bile duct, something Dr. Finks described as a "devastating injury." For this case to be on point with *Aguilera*, Dr. Berk would have to have testified that, even if he had achieved the CVOS, even if the IOC clearly showed him the anatomy, or even if a colleague helped him to correctly identify it, he was going to transect the common bile duct anyway; in other words, he would have done nothing differently even if he had successfully followed the protocol. But this is not what Dr. Berk said, nor was there evidence to support this supposition. Although Dr. Baker testified that he would have intentionally cut the common bile duct in order to remove the gallbladder, Dr. Berk made it clear that he did not intend to transect the common bile duct, that he had misidentified the structure *inadvertently*, that he immediately recognized a problem when he suspected that he had cut the bile duct, and that he understood it was an error to do so.

¶ 75    Other cases relied on by defendants are distinguishable on this same basis. In each of the cases they cite, the evidence demonstrated that, even if a negligently omitted step had been taken, it was not at all clear that the treatment rendered would have been any different. In *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 16 (1999), for example, the plaintiff sued for the stillborn death of her baby, alleging that the nurses who treated her failed to timely notify her doctor of the results of her fetal monitoring. Her doctor, however, stated that, even if he had received the results earlier, he would have misinterpreted the data in the same way that he ultimately did. *Id.* at 17. In *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 290-91 (2008), the patient went to an urgent care facility on a Thursday complaining of a severe headache and nausea, and was diagnosed with sinusitis and eustachian tube dysfunction. A CT scan the next day, however, revealed she was, in fact, suffering from a colloid cyst. Following the patient's transfer to a hospital, her condition worsened and she suffered brain herniation, which lead to irreversible brain damage and, ultimately, her death several years later. The plaintiff's expert testified that a CT scan should have been ordered when the patient first presented, and that treatment " 'would have been sooner, and sooner would have been better.' " *Id.* at 296. The appellate court found this insufficient to establish causation because there was no testimony establishing that a CT scan performed by the urgent care facility on Thursday, as opposed to Friday, would have resulted in different treatment (or a better outcome) after she arrived at the hospital. *Id.* at 298-99. In *Johnson*, 402 Ill. App. 3d at 844, the plaintiff alleged that her doctors negligently failed to advise her of the risks of a uterine rupture following two previous cesarean section births and failed to refer her to an obstetrician with delivery privileges, resulting in her emergency cesarean section and the subsequent death of her child. The plaintiff's expert admitted, however, that he did not know what treatment an obstetrician would have ordered had the plaintiff been referred earlier, and that it would have been an exercise of medical judgment whether to perform a cesarean section at that time. *Id.* at 845. Noting that the obstetrician who would have received the referral was never asked to testify about what his plan of treatment would have been, the appellate court determined there was insufficient evidence to support a causal nexus between the alleged deviations and resulting injury. *Id.* at 844, 847. Finally, in *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 408 (2000), the patient died from a severe infection caused by a kidney stone. The plaintiff alleged the doctors and hospital that treated the decedent failed to transfer her to an

intensive care unit or order an abdominal X-ray to identify the obstruction sooner. *Id.* at 411. The plaintiff's expert testified that, if the kidney stone had been identified, the treating physician would have had to call an interventional radiologist or a urologist to treat it, but the plaintiff presented no evidence of what a doctor with that expertise would have done to relieve the obstruction. *Id.* at 414-15.

¶ 76  In these cases there was a "fatal gap" in causation evidence, leaving the jury to speculate what a doctor with the requisite expertise would have done next if he possessed knowledge obtained through steps the plaintiff claimed were negligently omitted. Here, we need not even resort to reasonable inferences about what Dr. Berk would have done had he been able to conclusively identify the structures leading to and surrounding the gallbladder. Dr. Berk admitted at trial that, had he known the structure that he had clipped was, in fact, the common bile duct, he would not have proceeded to cut it. There is no question that he severed the common bile duct in error and not because he planned to do so. Thus, there is no "fatal gap" in the evidence.

¶ 77  Dr. Bines opined that, even if Dr. Berk had followed the four-step protocol, the common bile duct would still have been injured. Dr. Bines stated it was not possible to achieve the CVOS, that the IOC would have been risky and unhelpful, that the only person Dr. Berk would have consulted with–Dr. Baker–would not have done anything differently, and that a partial gallbladder removal was more risky for a patient like Dr. Vanderhoof than a common bile duct transection and reconstruction surgery. Taking Dr. Bines' testimony along with that provided by Drs. Berk, Barrera, and Baker, we agree that defendants elicited substantial evidence to refute plaintiff's expert evidence; however, all of the evidence in this case, when viewed in its aspect most favorable to plaintiff, does not so overwhelmingly favor defendants that no contrary verdict based on that evidence could ever stand. The conflicting expert testimony, as well as the credibility of both sides' experts, was a matter for the jury to weigh and resolve. The circuit court did not err in denying defendants' motion for judgment *n.o.v.*

¶ 78                              B. Evidence of Deviations From the Standard of Care

¶ 79  Defendants next claim that they are entitled to a new trial because the circuit court erred in admitting evidence of Dr. Berk's alleged deviation from the standard of care when, in fact, any such deviation was not causally linked to Vanderhoof's injuries and subsequent demise. Whether to admit expert testimony is an issue within the sound discretion of the circuit court; its ruling will not be reversed absent an abuse of that discretion (*Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003)), *i.e.*, when "no reasonable person would take the view adopted by the trial court" (internal quotation marks omitted) (*Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 198). Likewise, we will only reverse the trial court's denial of a motion for a new trial where we find an abuse of discretion. *Maple*, 151 Ill. 2d at 455.

¶ 80  Defendants first contend they were denied a fair trial because the circuit court denied their motion *in limine* and, instead, allowed Dr. Finks to testify at trial about Dr. Berk's failure to follow any of the four steps described by Dr. Finks. Defendants claim that the ruling was improper because: (1) the only alleged deviations "properly disclosed" in plaintiff's responses to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007) interrogatories involved Dr. Finks' opinions regarding the failure to attempt a CVOS, IOC, and consult with another surgeon, and did not include his opinion regarding a partial gallbladder removal; and (2) even if such failure amounts to a deviation from the standard of care, it was not ultimately a cause of Vanderhoof's

injuries. Defendants also contend that Dr. Finks' expert testimony merely reflected his own personal practice of performing a partial removal under the circumstances, which defendants assert is not a legally sufficient basis for establishing a standard of care (see *Walski v. Tiesenga*, 72 Ill. 2d 249, 259, 261 (1978)). The circuit court rejected these arguments and denied defendants' motion *in limine*, after concluding that Dr. Finks' opinion regarding a partial gallbladder removal had been sufficiently disclosed during his deposition prior to the trial. Rule 213(g) limits expert opinions at trial to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, *or in a discovery deposition*." (Emphasis added.) Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). We agree with the circuit court that Dr. Finks' testimony was sufficient to put defendants on notice that a partial gallbladder removal was the final step and last resort in the standard of care protocol that plaintiff intended to present at trial.

¶ 81    The remainder of defendants' challenges to the fairness of the trial focus again on the uncertainties perceived in Dr. Finks' testimony. Based on our review of the record, we find defendants' arguments generally suffer from the same faulty reasoning discussed above, *i.e.*, the notions that (1) each step in the four-step protocol must be stand or fall in isolation and (2) that Dr. Finks was required to rule out all other potential causes of decedent's injury in order to state to a reasonable degree of medial certainty that the alleged deviations increased the risk of harm or lost chance of recovery. Denial of defendants' motion for a new trial was proper because the circuit court did not abuse its discretion in admitting evidence of the deviations at issue in this case.

¶ 82                    C. Evidence of Medical Expenses as Damages

¶ 83    At the close of trial, the jury was instructed that it could award damages to compensate the plaintiff for losses suffered by her mother and her as a result of the death of her father, taking into consideration their relationship to him, mental suffering, grief, and sorrow. The court further instructed the jury that it could award damages to Vanderhoof's estate based on the nature, extent and duration of his injury, the reasonable and necessary medical expenses incurred by him, his pain and suffering, and his loss of normal life. The jury awarded a total of $910,742.79. Of this, $360,742.79 was awarded for the reasonable expenses of medical care, treatment and service received by Vanderhoof. This is the only aspect of the damages award defendants challenge. This is also the entire amount of damages plaintiff requested in this category, encompassing all of the charges incurred during the approximately two months that Vanderhoof received care in the hospital, with the exception of the first week following his surgery. This amount does not include, and plaintiff did not seek, expenses related to the surgery conducted by Dr. Barrera and Dr. Baker or the time Vanderhoof spent in a nursing facility.

¶ 84    Defendants argue they are entitled to remittitur in this amount because the circuit court erroneously admitted approximately 88 pages of Vanderhoof's medical records without requiring plaintiff to lay a foundation establishing that the expenses resulted from defendants' negligence. A circuit court may admit medical bills into evidence at its discretion and we will only reverse if there was an abuse of this discretion. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). As noted above, the standard calls on us to determine whether the court's rulings were against logic, arbitrary, or whether they exceeded the bounds of reason and ignored recognized principles of law, causing substantial prejudice. *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000).

¶ 85    To recover for medical expenses, a plaintiff must establish that the charges were reasonable, necessarily incurred as a result of injuries resulting from the defendant's negligence, and paid. *Arthur v. Catour*, 216 Ill. 2d 72, 81 (2005). Here, defendants argue that, because they never admitted that the medical expenses reflected in the bills were incurred as a result of their negligence,[5] plaintiff was required to lay a foundation through expert testimony connecting the dots between each charge and defendants' negligence. Without this testimony, defendants claim there was "no process other than speculation by which the jury could have translated the evidence." *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 108 (2006). The circuit court initially reserved ruling on defendants' motion *in limine* on this issue and encouraged the parties throughout trial to reach an agreement on an amount to be submitted to the jury. No agreement was reached, and defendants raised the issue again just before closing arguments.

¶ 86    Defendants' primary argument was that, although Dr. Finks testified that the bile duct injury more probably than not caused Vanderhoof's death, he only testified that the bile duct injury "could" have resulted in the various postoperative conditions Vanderhoof suffered from in the hospital. The circuit court expressed frustration with the parties for failing to question their witnesses to more firmly establish which charges were the result of the alleged negligence. It ultimately concluded, however, that the jury could draw inferences from the record that Vanderhoof's readmission to the hospital and decline in health were either completely or substantially related to his bile duct injury and the reconstruction surgery that it necessitated. The court found it reasonable, given these inferences, to submit the full amount of hospital expenses to the jury (with the bills themselves to go back to the jury room if defendants wished) and for defendants to have broad latitude to make their arguments, which the court felt went to the weight, and not the admissibility, of the evidence.

¶ 87    Plaintiff, for her part, has submitted no substantive argument in response to defendants' contentions, instead relying on the fact that there is no transcript detailing the court's reasoning at the time it decided to admit the medical bills themselves.[6] See *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 157 (2005) ("Without an adequate record preserving the claimed error, the reviewing court must presume the circuit court had a sufficient factual basis for its holding and that its order conforms with the law."). Defendants point to other places in the record, however, where the court's reasoning is provided, including the lengthy discussion on the record before closing arguments and another at the hearing on defendants' posttrial motion, where the court denied defendants' motion for remittitur. Because the circuit court's reasoning is clear from the record, we consider the merits of this argument.

---

[5]In response to plaintiff's request to admit, NorthShore admitted that the bills reflected charges for Vanderhoof's medical treatment during the stated time periods, that the charges were reasonable and necessary, and that the bills had been paid, but denied that any of the charges were incurred as a result of defendants' alleged negligence. Dr. Berk responded that he could neither admit nor deny that the bills reflected the medical expenses incurred by Mr. Vanderhoof or that they had been paid, but admitted that any charges for medical care rendered by him were reasonable and necessary medical expenses.

[6]Plaintiff's counsel suggested, during the oral argument in this appeal, that defendants may have forfeited this issue by failing to object when the medical expenses were presented to the jury during plaintiff's closing argument. We agree with defendants, however, that no authority requires counsel to object to contested evidence during closing argument in order to preserve prior objections.

¶ 88        Defendants argue that *Gill* stands for the proposition that merely publishing voluminous medical bills to the jury does not provide the jury with any reasonable basis for computing damages, and that it is plaintiff's burden to parse out the expenses to establish that each one is causally related to defendants' negligence. The circuit court correctly noted, however, that *Gill* involved multiple defendants and considerations of comparative fault not at issue here. See *Gill*, 157 Ill. 2d at 308. This is an important distinction. This case involves the alleged negligence of a single doctor performing a single procedure. The parties here essentially presented the jury with an all-or-nothing choice with respect to these medical expenses. Plaintiff's expert Dr. Finks testified that, if Vanderhoof had an uncomplicated surgery, meaning no bile duct injury, he would not have required a serious reconstruction surgery and would likely have left the hospital shortly after his surgery. Defendants' expert Dr. Bines, on the other hand, claimed Vanderhoof's outcome would have been exactly the same because the time he spent in the hospital, and ultimately his death, were caused by his inability to heal from the surgery,[7] not by any negligence on defendants' part. It is undisputed that neither side attempted to parse out the bills to establish that certain of them were caused by the alleged negligence and certain of them were not.

¶ 89        We do not agree, as defendants contend, that the circuit court shifted the burden to them to establish a causal link between the expenses and the alleged negligence. The court did fault defendants for failing to contradict or discredit positive, direct testimony from Dr. Finks that Vanderhoof would not have been hospitalized for a two-month period, during which time these expenses were incurred, absent his bile duct injury. Defendants failed to follow up on this point when Dr. Baker testified that not all of the expenses were caused by the bile duct injury, essentially presenting the jury with an "all-or-nothing" proposition: the jury could find that either (1) all of the submitted expenses were caused by Dr. Berk's alleged negligence, or (2) none of the expenses should be awarded because Dr. Berk did not act negligently. We agree with the circuit court that, in following this course, defendants forfeited their right to challenge Dr. Finks' assertion on a more granular level. See *Baker v. Hutson*, 333 Ill. App. 3d 486, 493 (2002) ("Where the testimony of a witness is neither contradicted by direct adverse testimony or by circumstances nor inherently improbable and the witness has not been impeached, the testimony cannot be disregarded by the fact finder." (citing *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981))). Furthermore, because the jury awarded the full amount of expenses sought by plaintiff, there is no indication that it engaged in any arbitrary or speculative apportioning of the expenses as might have been the case if it gave some discount off of the full amount not supported by the evidence. Under these circumstances, the circuit court did not

---

[7]The record establishes that Vanderhoof was subjected to a surgery that lasted longer than planned and longer than is typical even for an open cholecystectomy. Dr. Bines concluded both that Vanderhoof died of complications from pneumonia and that his postoperative complications "focused around" his inability to keep his lungs clear. He testified that "the operation having to go to open *and having a long surgery*" caused the pneumonia. (Emphasis added.) It can reasonably be inferred that the additional Roux-en-Y procedure required Vanderhoof to remain in surgery longer than he would have had his common bile duct not been injured. Thus, even if the jury agreed with Dr. Bines that the pneumonia, and not the common bile duct injury, was the primary cause of Vanderhoof's postoperative complications and eventually of the sepsis that killed him, it could reasonably have concluded from the evidence that the bile duct injury necessitated the longer reconstruction surgery and caused the pneumonia.

abuse its discretion either in submitting the full amount of requested medical expenses to the jury or in denying defendants' motion for entry of remittitur.

¶ 90                                    D. Statements of Counsel

¶ 91    Defendants argue that a new trial is alternatively warranted as a result of improper comments made by plaintiff's counsel during closing arguments and the examination of Dr. Baker. Defendants claim plaintiff's counsel misstated the law, improperly appealed to the emotions of the jury, and mischaracterized the evidence. As discussed below, we find these arguments largely forfeited because defendants failed to preserve the alleged errors by contemporaneously objecting to them at trial. We apply the forfeiture rule strictly where, as here, the comments identified by defense counsel do not constitute flagrant misconduct and are not so egregious that they denied defendants a fair trial. Further, in the few instances where an objection was made, the circuit court properly admonished and instructed the jury, curing any potential prejudice.

¶ 92                                       1. *Misstated Law*

¶ 93    Defendants first claim that plaintiff's counsel misstated the law with respect to plaintiff's burden of proof in his rebuttal argument by stating that all the plaintiff had to prove was that Dr. Berk should have *tried* the methods articulated by Dr. Finks to identify the structures surrounding Vanderhoof's gallbladder before cutting. Defendants only made a contemporaneous objection to one of five statements they now identify as misstatements of the law: "Ladies and gentlemen, the law in this case says it is good enough to say you have to try"; "It is good enough for me to prove that all he needed to do was try"; "All we have to prove to you is that he should have tried, and he didn't [Defense objection]"; "You heard it from Dr. Finks, failing to even attempt is a cause under the law"; and "All plaintiff has to prove is that Dr. Berk didn't give Vanderhoof a chance."

¶ 94    A party's failure to make a contemporaneous objection will generally result in forfeiture of the issue "unless the prejudicial error involves flagrant misconduct or behavior so inflammatory that the jury verdict is a product of biased passion, rather than an impartial consideration of the evidence." *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 375-76 (1990). Only where arguments are "so egregious that they deprived a litigant of a fair trial and substantially impaired the integrity of the judicial process itself" will we review them in the absence of a preserving objection. *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 170 (2006) (citing *Gillespie*, 135 Ill. 2d at 375-77). Defendants essentially ask us to apply the plain error doctrine. We are mindful that application of that doctrine in civil cases should be "exceedingly rare and limited to circumstances amounting to an affront to the judicial process." (Internal quotation marks omitted.) *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 120 (quoting *Holder v. Caselton*, 275 Ill. App. 3d 950, 959 (1995)).

¶ 95    Defendants are correct that, to establish proximate cause (as opposed to the underlying negligent conduct), plaintiff had to do more than simply establish Dr. Berk should have tried other methods for identifying the structures and failed to do so. The failure must have resulted in a lost chance of recovery for Vanderhoof. Where plaintiff's counsel talked at length about both the underlying negligent conduct and proximate cause in his closing arguments, however, it is unhelpful to pluck out certain statements of his and view them in isolation. That is not how the jury heard them. Taken in context, it appears that the statements were made in an effort to

differentiate between a failure to try that deprived the patient of a chance of recovery (something plaintiff was required to demonstrate) and a failure to try that may have resulted in a better outcome (something that was not required). The statement below, for example, becomes unobjectionable when taken in context:

"In this case, if Dr. Berk's negligence deprived Paul of even a chance of a successful surgery and recovery, then they are liable under the law. *It is good enough for me to prove that all he needed to do was try.* We don't have to prove a better outcome. That's what the law is in this case." (Emphasis added.)

¶ 96    Defendants make much of the fact that the statements were made during plaintiff's rebuttal arguments, purportedly depriving defense counsel of the opportunity to further address the jury, but it was defense counsel's decision not to object to four of the five statements when they were made. Nor did the circuit court's decision to make no ruling on the single contemporaneous objection leave the jury with the impression that plaintiff's counsel's remarks were not objectionable. Defense counsel objected on the record to what it felt was a mischaracterization of the law and the circuit court cautioned the members of the jury in a neutral manner that it would instruct them on the law:

"[THE COURT]: The ladies and gentlemen heard the evidence, and the Court is going to instruct you on the law that applies to this case. You will apply the law that's given to you to the evidence that you find in this case as the fact finder."

When plaintiff's counsel objected to alleged misstatements of the law during defense counsel's closing argument, the court handled the objections in an identical manner. The court later repeated its admonition to the jury and instructed it on proximate cause using the long form pattern instruction, which incorporated defendants' proposed instruction.

¶ 97    Defendants cite several cases supporting their proposition that "[w]hen a case is tried under an incorrect theory of law the appropriate action is to reverse the judgment and remand for a new trial." *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 495-96 (1974) (jury instruction improperly stated the law); *Advincula v. United Blood Services*, 176 Ill. 2d 1, 40-41 (1996) (circuit court misstated the law); *Spurgeon v. Alton Memorial Hospital*, 285 Ill. App. 3d 703, 708-09 (1996) (objection to counsel's misstatement of the law was overruled by the court). This case, however, was not tried under an incorrect theory of law. Any failure by plaintiff's counsel to fully elucidate the law on proximate cause during his closing arguments was remedied by a contemporaneous and repeated admonition by the circuit court that it, not the lawyers, would provide the applicable law, and by use of the long form of Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d ed. 1994) on proximate cause. Because the lost chance doctrine is not a separate theory of recovery but is encompassed by a standard proximate cause analysis, this instruction accurately states the law in lost chance medical malpractice cases. See *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 463 (2001) (noting that "[w]henever an IPI instruction is applicable in a civil case, the court, giving due consideration to the facts and the prevailing law, is required to use that instruction").

¶ 98                                                  2. *Appeals to Emotion*

¶ 99    Defendants additionally argue that a new trial is warranted because plaintiff's counsel made statements in his closing and rebuttal arguments that improperly appealed to the jury's emotions, asking it to render a moral or social judgment. Specifically, defendants point to a handful of statements referencing the importance of this trial to the community and the role of

trials generally in policing the medical profession for the protection of all patients. Defendants only objected to one of these statements. As noted above, the failure to object to alleged errors in an opponent's closing argument generally results in forfeiture of any objections that could have been made. *Gillespie*, 135 Ill. 2d at 375-76. Although the statements made by plaintiff's counsel may have arguably crossed the line into improper commentary not tethered to the specific facts of this case, we do not find them so prejudicial that defendants were deprived of a fair trial.

¶ 100 The cases relied on by defendants do not persuade us otherwise. See *Spyrka*, 366 Ill. App. 3d 156; *Pleasance v. City of Chicago*, 396 Ill. App. 3d 821, 827 (2009); *Zoerner v. Iwan*, 250 Ill. App. 3d 576 (1993). In *Spyrka*, the court did not hold that the statements made in that case–calling on the jury to use its voice to protect the medical system and to determine what treatment should be given to patients in the future–were prejudicial enough to warrant plain error review, but instead merely noted in *dicta* that such arguments should be avoided on remand for a new trial. 366 Ill. App. 3d at 169-70. The statements made in *Zoerner v. Iwan*, 250 Ill. App. 3d 576 (1993), a case in which defense counsel urged the jury not to award damages to the victim of a traffic accident in which both parties had allegedly been drinking, are furthermore distinguishable. There, counsel emphasized that drinking and driving is not right and should not be rewarded, exhorted the jurors to send a message that it is wrong with their verdict, and encouraged them to focus on this message rather than the specific circumstances of the plaintiff, who could " 'get on with his life and put this behind him.' " *Id.* at 584-85. The statements were especially improper where the jury was only being asked to determine proximate cause and damages; the conduct of the parties was not even at issue. *Id.* The same was true in *Pleasance v. City of Chicago*, 396 Ill. App. 3d 821, 827 (2009), where the defendant admitted liability and the only issue was damages. There, counsel engaged in repeated commentary (over a dozen statements, including a quote from Dr. Martin Luther King, Jr.) on the willful and wanton behavior of the defendant, and the way the plaintiff died, despite an order on a motion *in limine* barring such comments and several admonishments by the court. *Id.* at 824-29. These are not the circumstances we find here. Plaintiff's counsel's statements seem aimed at making the jurors appreciate the importance of their role and civic duty, but do not specifically call upon them to "send a message" or to base their verdict on anything other than the facts of the case.

¶ 101 We do not find prejudice where, when the sole objection was made, it was promptly sustained, counsel was admonished in front of the jury, and the jury was instructed on the nature of opening and closing arguments. Counsel's statement–"We need to embrace the sense of community that we live in, care about each other, protect each other."–is relatively vague and does not specifically call upon the jury to use its verdict to send a message. Even if it were so construed by the jury, any resulting harm was cured when the court sustained defense counsel's objection, stating: "Move along. Improper argument. To send a message is not a proper argument. Move along counsel." See *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 383 (2003) ("A circuit court's decision to sustain an objection and instruct the jury to disregard the remark cures the prejudicial impact from the improper statement."). The court shortly thereafter instructed the jury not once but twice that opening and closing arguments are not evidence and, if remarks by the attorneys do not follow the evidence or a reasonable inference that can be drawn from the evidence, they must be disregarded. Members of the jury were also told that it was their "duty to resolve th[e] case by determining the facts and following the law

- 23 -

given in the instructions," and that their "verdict must not be based upon speculation, prejudice, or sympathy."

¶ 102    We are mindful that, "[i]n determining whether a party has been denied a fair trial because of improper closing argument, [a] reviewing court gives considerable deference to the trial court because it is in a superior position to assess the accuracy and effect of counsel's statements." *Limanowski v. Ashland Oil Co.*, 275 Ill. App. 3d 115, 118 (1995). Whether improper remarks of counsel are so prejudicial as to deprive an opposing party of its right to a fair trial is within the sound discretion of the circuit court. *Id.* (citing *Balzekas v. Looking Elk*, 254 Ill. App. 3d 529, 535 (1993)). Here, the parties made these same arguments in their briefing on defendants' posttrial motion and the circuit court found no grounds for granting a new trial, noting that plaintiffs or prosecutors often make arguments meant to invoke a "call to duty" so to speak, to encourage juries to live up to their duties, particularly in challenging cases involving respected doctors in the community like Dr. Berk; that defendants were represented by very experienced and capable attorneys who may have had strategic reasons for not making contemporaneous objections; that the court sustained the sole objection that was made and took steps to cure any prejudice; and that the resulting verdict, which was less than what the plaintiff sought, was not a "send-a-message-type verdict." The court did not abuse its discretion in refusing to order a new trial on these grounds.

¶ 103                              3. *Mischaracterized Evidence*

¶ 104    Defendants also contend that plaintiff's counsel misrepresented the evidence in two respects: (1) by indicating in closing arguments that Dr. Baker "had an interest" in the case, and (2) by mischaracterizing Dr. Barrera's testimony regarding whether inflammation made it impossible to dissect the tissue surrounding Vanderhoof's gallbladder without injuring the common bile duct. Counsel is generally given wide latitude to argue reasonable inferences from the evidence in closing arguments (*Lagoni v. Holiday Inn Midway*, 262 Ill. App. 3d 1020, 1037 (1994)), but "may not misrepresent the evidence, argue facts not in evidence, nor create his own evidence during closing argument." (Internal quotation marks omitted.) *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 383 (2000). Although counsel may not express their own personal beliefs on the issues or vouch for the credibility of witnesses, they are permitted to comment on the evidence presented at trial and on how that evidence bears on the credibility of witnesses. See *Lagoni*, 262 Ill. App. 3d at 1037.

¶ 105    Here, statements made by plaintiff's counsel during his rebuttal closing argument highlighted the connection between Dr. Baker, one of defendants' key witnesses, Dr. Berk, and defendant NorthShore ("Dr. Baker has an interest in this case"; "What motivation would Dr. Baker have for coming into court *** his motivation is he works for a party in this case"; Dr. Baker was "trying to protect their own company, their own corporation"; "If someone asks you *** why shouldn't we believe Dr. Baker *** you tell them, because they're trying to protect Dr. Berk when they should be trying to protect their patients."). Plaintiff's counsel did not express his own personal beliefs regarding Dr. Baker's credibility; he merely commented on the evidence adduced at trial. That evidence established that, shortly after Vanderhoof's death and before a lawsuit was pending, Dr. Baker wrote on the death certificate that the cause of death was a bile duct injury leading to sepsis; Dr. Baker later testified at trial that he made a mistake and this was in fact not the cause of death; and Dr. Baker has past and current present professional ties with the defendants.

- 24 -

¶ 106    Defense counsel objected to the comments at trial, emphasizing that, although Dr. Baker is a former partner of Dr. Berk and an employee of defendant NorthShore, he is not an adverse party and, in the legal sense of the word, has no interest in the outcome of the case. Defense counsel told the jury: "Dr. Baker is not a defendant in this case. He has no interest in the outcome. The outcome doesn't affect him." Although defendants now claim this was not sufficient and that the admonition should have come from the court and plaintiff's counsel's comments during argument should have been stricken, their counsel seems to have agreed at the time that her opportunity to address the jury would cure her objection. ("[Defense counsel]: I think it needs to be said. THE COURT: You can say it, counsel, right? [Defense counsel]: Sure."). Based on this exchange, we find this argument waived. Even if it is not, the opportunity provided by the circuit court for defense counsel to clarify Dr. Baker's status strikes us as more than sufficient to have cleared up any potential confusion in the jurors' minds.

¶ 107    Defendants also claim that plaintiff's counsel misrepresented Dr. Barrera's testimony during the questioning of Dr. Baker, suggesting to the jury (and to Dr. Baker) that Dr. Barrera in fact believed it was possible to remove Vanderhoof's gallbladder without injuring the common bile duct. We disagree with this characterization. As defendants point out, Dr. Barrera testified twice that he did not know whether it was possible to remove Vanderhoof's gallbladder without injuring the common bile duct. Dr. Baker, on the other hand, unequivocally testified that it was *im*possible. These are two different answers. Plaintiff's counsel's follow-up question to Dr. Baker–"Do you know that Dr. Barrera disagrees with you on that?"–is accurate in the sense that Dr. Barrera did not agree that it was impossible. Nor, of course, did he testify that it was possible. He testified that he did not know. Defendants argue that plaintiff's counsel's questioning improperly insinuated that he said it was possible, but there is no evidence of this. Plaintiff's counsel may have been trying to get Dr. Baker to agree with Dr. Barrera that, in hindsight, one can never really know what was possible at the time of the surgery (see the question immediately preceding the cited exchange: "Would it be fair to say we'll never really know whether anything could have been done because by the time Dr. Berk called anyone in to help him, the damage had already been done?"), but his questions did not misrepresent to the jury that Dr. Barrera thought an injury-free gallbladder removal was possible.

¶ 108    Plaintiff's counsel then asked "And *if* Dr. Barrera says that it was not impossible to get this gallbladder out without injury to the common bile duct, you disagree with him?" to which Dr. Baker answered, "Yeah, I disagree completely." (Emphasis added.) The question is somewhat confusing due to the double negative. With the qualifier "if," however, counsel essentially presented a hypothetical. Dr. Barrera's answer, that he did not know whether it was possible or not, left open a scenario in which it was "not impossible," and plaintiff's counsel was entitled to question Dr. Baker regarding whether he agreed or disagreed with that possibility.

¶ 109    In the end, the jury heard the testimony of both doctors, as well as defense counsel's closing argument, which reiterated Dr. Barrera's testimony ("Dr. Barrera never said 'I don't think it's impossible to attempt it.' He said, 'I don't have an opinion. I don't know.' "). It is our view that plaintiff's questioning of Dr. Baker would not have led a reasonable jury to believe that Dr. Barrera felt it was possible to dissect the gallbladder without injury to the common bile duct. The circuit court did not abuse its discretion when it denied defendants' motion for a new trial based on these alleged errors. In sum, although no trial is perfect, we believe that

defendants received a fair trial.

¶ 110                           E. Manifest Weight of the Evidence

¶ 111    Defendants alternatively argue that, even if judgment as a matter of law is not proper, plaintiff's causation evidence was not sufficient to support the verdict, and they are entitled to a new trial. A circuit court may set aside a verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence, *i.e.,* where "the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 454. We review a circuit court's denial of a motion for a new trial for abuse of discretion, bearing in mind that "[t]he presiding judge in passing upon the motion for new trial has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." (Internal quotation marks omitted.) *Id.* at 456.

¶ 112    Defendants' argument lacks merit for the reasons we have already explained above. Where an issue must be decided based on the conflicting testimony of expert witnesses, it is appropriate for the jury, as the trier of fact, to resolve that battle of the experts. See *Perkey*, 2013 IL App (2d) 120470, ¶ 66 (citing *Davis v. Kraff*, 405 Ill. App. 3d 20, 37-38 (2010)). Dr. Finks testified that the standard of care required Dr. Berk to use the four-step protocol to avoid, or minimize the risk of, transecting the common bile duct. Dr. Bines testified that the standard of care did not require Dr. Berk to attempt any of those steps; he went so far as to say that the only way to remove the patient's gallbladder in this case was to intentionally sever the common bile duct. Dr. Berk admittedly did not follow any of the four steps, nor did he attempt to follow them. Drs. Barrera and Baker both believed that Dr. Berk acted reasonably and did not deviate from the standard of care. The jury in this case was in a superior position to assess the credibility of these fact and expert witnesses and to give weight to the testimony it heard. We do not find that "the opposite conclusion is clearly evident" or that the jury's findings are "unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 454.

¶ 113    Therefore, the verdict is not against the manifest weight of the evidence.

¶ 114                                    CONCLUSION
¶ 115    For the reasons stated, we affirm the judgment of the circuit court.

¶ 116    Affirmed.